**PARKER–HANNIFIN CORPORATION, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 96–2580.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 29, 1998.

Decided March 23, 1998.

William R. Stewart (argued and briefed), Thompson, Hine & Flory, Cleveland, OH, for Petitioner–Appellant.

Gary R. Allen, Acting Chief, Kenneth L. Greene (briefed), Annette Wietecha (argued and briefed), U.S. Department of Justice, Appellate Section Tax Division, Washington, DC, for Respondent–Appellee.

Before: NELSON, SUHRHEINRICH, and GILMAN, Circuit Judges.

## OPINION

SUHRHEINRICH, Circuit Judge.

Parker–Hannifin Corporation (Parker) appeals from the judgment of the United States Tax Court disallowing a substantial portion of the income tax deduction it claimed for its $42 million contribution to a welfare benefit fund on June 30, 1987. We **AFFIRM IN PART AND REVERSE IN PART**.

### I.

The facts are set forth in greater detail in the Tax Court's opinion at T.C. Memo.1996–337, 1996 WL 412009. Parker is an accrual basis taxpayer which files its Federal income tax returns on a June 30 fiscal year. Parker and its subsidiaries are engaged in, among other things, the design, manufacture, and marketing of components and systems for builders and users of durable goods, including products controlling motion, flow, and pressure. As of June 30, 1987, Parker had 28,708 employees, of whom approximately 1,854 (6.46%) were represented by unions.

### A.

On June 30, 1987, Parker established the Parker–Hannifin Employees Welfare Benefit Trust (hereinafter the "VEBA Trust") with Ameritrust Company National Association (Ameritrust) as trustee. The VEBA Trust uses the cash method of accounting and has a fiscal year ending June 30. The parties have stipulated that the VEBA Trust qualifies as a

welfare benefit fund under 26 U.S.C. § 419(e).[1]

Parker designed the VEBA Trust to serve as the funding medium for certain employee welfare benefit plans. The Trust Agreement Creating the Parker–Hannifin Corporation Voluntary Employees' Beneficiary Association (hereinafter the "Trust Agreement") stated that the purpose of the VEBA Trust was to provide "health care, disability, life, and other welfare benefits under the Plans to Members, Dependents, and Beneficiaries, other than post-retirement health care and life benefits for 'key employees,' as that term is defined in Section 416(i) of the Code." According to the Trust Agreement, Parker intended:

> to make contributions, on a sound actuarial basis, to the Trustee, on or before the last day of the Corporation's fiscal year, in such amounts as determined to be necessary to provide benefits required under the Plans. The Corporation's determination of such contributions shall be final and conclusive upon all persons. . . .

Contributions to the VEBA Trust, once made, were irrevocable. The Trust Agreement also provided that "[n]otwithstanding any provision of this Agreement to the contrary, in no event shall the Corporation be required to continue to fund benefits under any Plan through the Trust."

On June 30, 1987, Parker contributed $42 million (hereinafter the "1987 contribution") to the VEBA Trust. Effective July 1, 1987, the maximum Federal income tax rate for corporations decreased from 46% to 34%. Parker's 1987 contribution to the VEBA Trust consisted of the following amounts:

| | |
|---|---:|
| Incurred but unpaid medical, dental, & short-term disability benefits | $9,022,227 |
| Administration fees | 479,089 |
| Long-term disability benefits | 2,500,000 |
| Union medical benefits | 3,210,991 [2] |
| Post-retirement benefits | |
| a) Retirees | 10,779,650 |
| b) Active employees | 16,133,508 |
| Total | $42,125,465 [3] |

The VEBA Trust funded the Parker–Hannifin Group Insurance Plan and the Long–Term Disability Plan for Salaried Employees of Parker–Hannifin Corporation. Director of taxation, Joseph B. Dorn, was primarily responsible for the implementation and funding of the VEBA Trust.[4]

Parker reflected $33.6 million of the 1987 contribution on its balance sheet as a "prepaid expense" under the category of current assets and the remaining $8.4 million as an "other asset." With respect to the provision of health care and life insurance benefits, Parker's 1987 annual report stated:

> In addition to providing pension benefits, the Company provides certain health care and life insurance benefits for retired employees. Substantially all of the Company's employees may become eligible for those benefits if they become eligible for retirement while working for the Company. The cost of retiree health care and life insurance benefits is recognized as expense as claims are paid. . . .

Parker never notified any of the labor unions which represented its employees of the existence of the VEBA Trust, Parker's contribution to the VEBA Trust, or the existence of any reserves of the VEBA Trust.[5] Nor did Parker notify any of its employees or retirees except for those employees who were involved in the implementation of the

---

1. 26 U.S.C. § 419(e)(1) defines a "welfare benefit fund" as any fund that is part of a plan of an employer, and through which the employer provides welfare benefits to its employees or their beneficiaries.

2. This figure represented expenses which were estimated to be incurred but unpaid after June 30, 1987.

3. Parker's chief financial officer suggested rounding the amount of the 1987 contribution to $42 million.

4. For an explanation of Mr. Dorn's calculation of each portion of the 1987 contribution, see *Parker–Hannifin Corp. v. Commissioner,* T.C. Memo. 1996–337, 1996 WL 412009.

5. None of Parker's collective bargaining agreements required the use of a welfare benefit fund or prefunding of the negotiated benefits.

VEBA Trust. Parker never disclosed the existence of the VEBA Trust or any reserves of the VEBA Trust on any of the summary plan descriptions which Parker provided to its employees to notify them of its pension and retirement plans.

In addition, Parker made no specific disclosure to its shareholders or the public that it had prefunded the VEBA Trust. For example, in its annual reports for 1987, 1988, and 1989, Parker disclosed the prefunding of certain future employee benefits under the heading "Other." The explanation of "Other," as provided in Parker's 1987 Annual Report, was as follows:

> Other increases in assets included an increase in "Prepaid expenses" and "Investment in joint ventures and other assets" as a result of prefunding certain future employee benefits. "Excess cost of investments" increased primarily as a result of the acquisition of United Aircraft Products, Inc.

### B.

In a July 2, 1987, letter to the vice president of Ameritrust, W.C. Young, Parker's treasurer, stated:

> Disbursements from this Trust will take the form of wire transfers to the Provident Insurance Company on Wednesday of each week and will run between $500,000 and $1,000,000 per transfer. Based on such a schedule it is anticipated that the $42,000,-000 deposited in the Trust will be paid out within 12 to 18 months. . . .

Similarly, in its "Tax Matters" document for June 1987, Parker stated: "It is estimated that the initial contribution to the VEBA and the earnings thereon will be depleted in approximately 14–18 months, primarily through the payment of health care benefits for active employees."

Beginning in September 1987, Parker deposited into the VEBA Trust amounts it had withheld from its employees for their share of the cost of providing the covered benefits. The VEBA Trust used its assets, which consisted solely of the 1987 contribution, employee contributions, and interest income, to pay the current cost of providing benefits to Parker's employees and retirees as the benefits came due during fiscal 1988 and the first 2 months of fiscal 1989. Beginning in August 1988, the VEBA Trust used its assets, consisting solely of amounts that were currently contributed and currently deducted by Parker along with employee contributions, to pay the current cost of providing benefits to Parker's employees and retirees as those benefits became due.

In August 1988, Parker filed a Form 1024 (i.e., an application for exemption from federal income tax) for the VEBA. Included with the application was unaudited financial statement information for Parker's 1988 fiscal year. This information indicated that $42,-450,649.30 of benefits had been paid from the VEBA Trust as of June 30, 1988. On November 29, 1988, Parker received a determination letter from the Internal Revenue Service, which stated that the application for recognition of exemption under 26 U.S.C. § 501(c)(9) had been approved. The determination letter expressed no opinion as to whether Parker's contribution to the VEBA Trust was deductible.

The following table reflects the deposits, earnings, withdrawals, and ending balances of the VEBA Trust for fiscal years 1987, 1988, 1989, and 1990:

| | Fiscal Years | | | |
| | 1987 | 1988 | 1989 | 1990 |
| --- | --- | --- | --- | --- |
| Employer contributions | $42,000,000.00 | –0– | $40,737,374.59 | $50,783,404.03 |
| Employee contributions | –0– | $1,555,626.86 | 1,841,554.51 | 2,505,995.35 |
| Interest earned | 773.98 | 1,749,030.80 | 78,641.10 | –0– |
| Benefits paid | –0– | 39,153,640.83 | 48,808,587.03 | 53,289,359.38 |
| Ending balance | 42,000,773.98 | 6,151,016.83 | –0– | –0– |

## C.

On its Form 1120 (U.S. Corporation Income Tax Return) for 1987, Parker deducted its entire $42 million contribution to the VEBA Trust. The Commissioner of Internal Revenue (Commissioner) allowed Parker partial deductions in the amount of $9,022,227 for incurred but unpaid medical, dental, and short-term disability benefits and $353,624 for administrative expenses. The Commissioner subsequently conceded a deduction for additional administrative expenses in the amount of $125,465. Parker then petitioned the United States Tax Court, which sustained the Commissioner's disallowance of the remainder of the deduction Parker had claimed for its 1987 contribution ($32,498,-684). Parker now appeals from the judgment of the Tax Court. *See* 26 U.S.C. § 7482(a)(1).

## II.

Enacted as part of the Deficit Reduction Act of 1984 (DEFRA), Pub.L. 98–369, 98 Stat. 854–860, 26 U.S.C. §§ 419 and 419A limit deductions for contributions made by a taxpayer to an employee welfare benefit fund.[6] Under prior law, taxpayers generally could deduct the entire amount of their contribution to a fund in the year made, despite the fact that benefits might be paid out over several years. *See Connecticut Mutual Life Ins. Co. v. Commissioner,* 106 T.C. 445, 459–60, 1996 WL 348211 (1996). The House report on § 419 concluded "that the current rules under which employers may take deductions for plan contributions far in advance of when the benefits are paid allows excessive tax-free accumulation of funds." H. Rept. No. 98–432 (Pt. 2), at 1275 (1984), U.S.Code Cong. & Admin.News 1984, pp. 697, 936.

We begin with the detailed statutory framework contained in §§ 419 and 419A. Section 419(a)(1) generally denies a deduction for contributions paid or accrued by an employer to a welfare benefit fund. However, if such contributions would otherwise be deductible, § 419(a)(2) permits a deduction for the taxable year in which the contribution is paid, subject to the limitation contained in § 419(b).

Section 419(b) limits the amount of the deduction for any taxable year to the welfare benefit fund's "qualified cost." The qualified cost is equal to the sum of the fund's "qualified direct cost" for such year, and, subject to the limitation of § 419A(b), any addition to a "qualified asset account" (QAA) for the year. *Id.* § 419(c)(1). The fund's qualified cost for the taxable year is reduced by the fund's after-tax income for that year. *Id.* § 419(c)(2). A contribution to a welfare benefit fund in excess of that year's qualified cost is treated as a contribution by the employer to the fund during the succeeding taxable year. *Id.* § 419(d). In the present case, no benefits were paid from the VEBA Trust during the 1987 taxable year, and thus no qualified direct costs were incurred. Therefore, in order to be deductible, Parker's contribution must constitute an addition to a QAA.

Section 419A sets forth the rules governing QAA's. Section 419A(a) defines a QAA as any account consisting of assets set aside to provide for the payment of (1) disability benefits, (2) medical benefits, (3) SUB (supplemental compensation benefit) or severance pay benefits, or (4) life insurance benefits. Section 419A(b) contains an important limitation: additions to a QAA are included in the fund's qualified cost only to the extent they do not exceed the fund's "account limit" for the taxable year.

For purposes of the present case, the account limit includes: (1) the amount reasonably and actuarially necessary to fund claims that are incurred but unpaid as of the close of the taxable year and related administrative costs; and (2) an additional reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for post-retirement medical and life insurance benefits. *Id.* § 419A(c)(1)-(2). No account

limit applies to a QAA for a separate welfare benefit fund that is maintained pursuant to a collective bargaining agreement. *Id.* § 419A(f)(5)(A).

With this framework in mind, we now consider that portion of Parker's 1987 contribution which is in dispute. We review the Tax Court's factual findings for clear error and its legal conclusions de novo. *Smith v. Commissioner,* 926 F.2d 1470, 1474 (6th Cir.1991). Parker bears the burden of demonstrating that it is entitled to the deduction it has claimed. *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79, 84, 112 S.Ct. 1039, 1042–43, 117 L.Ed.2d 226 (1992).

### III.

Of its $42 million contribution in 1987, Parker included $10,779,650 for post-retirement benefits for retirees and $16,133,508 for post-retirement benefits for still active employees. The Commissioner disallowed the deduction for both amounts. Relying upon its prior decision in *General Signal Corp. v. Commissioner,* 103 T.C. 216, 1994 WL 450465 (1994), the Tax Court concluded that these portions of the 1987 contribution did not qualify as a "reserve funded over the working lives of covered employees." 26 U.S.C. § 419A(c)(2). As a result, the court held that this portion of Parker's contribution did not constitute an "addition to a qualified asset account," *id.* § 419(c)(1)(B), and, therefore, was not currently deductible. In *General Signal,* the Tax Court had determined, on the basis of the plain language of the statute and the relevant legislative history, that § 419A(c)(2) necessarily requires that a taxpayer *accumulate* assets for the payment of post-retirement benefits. In the present case, the Tax Court held that "the VEBA Trust did not retain even general assets that were sufficient to fund the reserves claimed by petitioner." *Parker–Hannifin Corp. v. Commissioner,* T.C. Memo. 1996–337, 1996 WL 412009. The court noted, among other things, that the entire amount of Parker's 1987 contribution had been depleted by the second month of Parker's 1989 taxable year.

Parker argues that the Tax Court's interpretation of § 419A(c)(2) is erroneous. In particular, Parker contends that § 419A(c)(2) does not require that assets actually be set aside or accumulated. In Parker's view, a reserve represents a liability, not a fund of assets. Parker maintains that the statutory phrase "reserve funded over the working lives of the covered employees" is only a mathematical computation which serves to limit the amount of the deduction an employer can take in any taxable year for its contributions to a welfare benefit fund. Parker argues that § 419A(c)(2) establishes the measure of the maximum amount of the reserve liability component of a welfare benefit fund's account limit for the year. According to Parker, the modifying phrase "funded over the working lives of the covered employees" in § 419A(c)(2) merely "describes the method in which the amount of the reserve included in the account limit is included (i.e. over what period the reserve is computed)." This provision does not require, contends Parker, the establishment of any funded reserve, and it bears no relationship to a particular fund's assets. We disagree for the reasons set forth below.

We begin with the language of the statute itself, *Bread Political Action Committee v. FEC,* 455 U.S. 577, 580, 102 S.Ct. 1235, 1237–38, 71 L.Ed.2d 432 (1982), and interpret it according to its plain language absent evidence of a contrary legislative intent, *United States v. Apfelbaum,* 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980). The plain meaning of the term "reserve" supports the Commissioner's interpretation of § 419A(c)(2); i.e., that assets must be set aside and accumulated for the payment of post-retirement medical and life insurance benefits. *See, e.g.,* BLACK'S LAW DICTIONARY 1360 (6th ed.1990) (defining "reserve" to mean, among other things, "[f]unds set aside to cover future expenses, losses, claims, or liabilities."). As the Tax Court correctly stated: "On its face, the language 'reserve funded' suggests that Congress intended this provision [§ 419A(c)(2) ] to allow the *accumulation* of funds by a welfare benefit fund for the purpose of providing post-retirement benefits." *General Signal,* 103 T.C. at 239.

In support of its position, Parker points to case law which interprets the term "reserve," as used in the context of the insurance industry, to mean a liability. *See Western Nat'l Mutual Ins. Co. v. Commissioner,* 102 T.C. 338, 350, 1994 WL 60382 (1994) ("In the insurance industry, a policy reserve represents a liability; i.e., it represents an obligation to the policyholders."), *aff'd,* 65 F.3d 90 (8th Cir.1995). Parker argues that the term should receive the same interpretation for purposes of § 419A(c)(2), which utilizes actuarial computations like the insurance industry. Parker's argument is unpersuasive. Indeed, the case law which Parker itself cites expressly recognizes that "[t]he term 'reserve' is used differently in the insurance industry than it is in certain other commercial situations." *Id.* "In insurance parlance, reserves are not considered to be trust funds or funds in escrow." *Id.*

Our interpretation of the statute is solidly confirmed by a review of the relevant legislative history. The committee report with respect to § 419A(c)(2) is of particular relevance. It provides as follows:

> *Prefunding of life insurance, death benefits, or medical benefits for retirees.*—The qualified asset account limits allow amounts reasonably necessary to accumulate reserves under a welfare benefit plan so that the medical benefit or life insurance (including death benefit) payable to a retired employee during retirement is fully funded upon retirement. These amounts may be accumulated no more rapidly than on a level basis over the working life of the employee, with the employer of each employee.... The conferees intend that the Treasury Department prescribe rules requiring that the funding of retiree benefits be based on reasonable and consistently applied actuarial cost methods, which take into account experience gains and losses, changes in assumptions, and other similar items, and be no more rapid than on a level basis over the remaining working lifetimes of the current participants (reduced on the basis of reasonable turnover and mortality assumptions).

H. Conf. Rept. No. 98–861, at 1157 (1984), U.S.Code Cong. & Admin.News 1984, p. 1845.

Neither the plain language of the statute nor the legislative history supports Parker's contention that the term "reserve" refers only to a mathematical computation of the reserve liability component of a welfare benefit fund's account limit for the year. To the contrary, these sources plainly indicate that Congress intended to permit a deduction under § 419A(c)(2) only when the employer was accumulating assets in a welfare benefit fund in order to provide post-retirement benefits. Parker's construction of § 419A(c)(2), if adopted, would thwart the underlying congressional aim. Treating the language of § 419A(c)(2) as nothing more than a calculation of a liability would undermine Congress's goal of encouraging employers to fund a reserve so as to guarantee the existence of post-retirement medical and life insurance benefits for their employees. *See id.* As the Government points out on brief: "A reserve without funds, quite obviously, is a mere fiction."

The legislative history behind the enactment of §§ 419 and 419A in DEFRA indicates that Congress sought "to prevent employers from taking premature deductions for expenses which have not yet been incurred, by interposing an intermediary organization which holds assets which are used to provide benefits to the employees of the employer." H. Conf. Rept. No. 98–861, at 1155, U.S.Code Cong. & Admin.News 1984, p. 1843; *accord General Signal,* 103 T.C. at 243. In § 419A(c)(2), Congress permitted a narrow exception to this rule. Congress permitted employers who accumulate assets in a reserve to claim a deduction in the taxable year in which the contribution is made, so long as the reserve is funded over the working lives of the covered employees and is actuarially determined on a level basis (employing assumptions that are reasonable in the aggregate) as necessary for the provision of post-retirement medical and life insurance benefits to their employees. 26 U.S.C. § 419A(c)(2).

However, § 419A(c)(2) plainly establishes a quid pro quo. Congress affords employers

the benefit of a current deduction. In exchange, employers must accumulate assets in a reserve "so that the medical benefit or life insurance (including death benefit) payable to a retired employee during retirement is fully funded upon retirement." H. Conf. Rept. No. 98–861, at 1157, U.S.Code Cong. & Admin.News 1984, p. 1845. Parker's interpretation of § 419A(c)(2) would permit employers to circumvent the congressional goal of eliminating premature deductions for expenses not yet incurred without requiring them to accumulate assets in order to ensure the existence of sufficient post-retirement benefits. We do not believe that Congress intended such a result. The situation is compounded in the present case, since the corporate federal income tax rate decreased from 46% for the 1987 taxable year to 34% for the 1988 taxable year. Thus, Parker was able to increase significantly the value of its income tax deduction by claiming it in a year in which a higher federal income tax rate was applicable. One may infer that Parker's motivation for the creation of the VEBA Trust was to maximize what it perceived to be a one-time, tax-saving opportunity.

Parker's remaining arguments concerning the Tax Court's interpretation of § 419A(c)(2) are unpersuasive, and we reject them as well. For instance, Parker contends that the effect of the Tax Court's decision is to require, contrary to congressional intent, the establishment of separate accounts for employee post-retirement benefits. Parker maintains that, when intended, Congress specifically provided for the creation of separate accounts in the language of the statute. Parker's argument lacks merit. Neither in *General Signal* nor in the present case has the Commissioner argued for such an interpretation of the statute. *See General Signal,* 103 T.C. at 246. What is necessary, however, is that Parker maintain a balance in the VEBA sufficient to support the post-retirement benefits for which it takes a deduction.

Parker also attempts to rely on the fact that the VEBA Trust only paid benefits which are permitted under § 419A(c)(2).

Parker's reliance is misplaced. While this fact may be relevant for purposes of determining the VEBA's tax exempt status, it is irrelevant to the question of whether the contribution is deductible in the year made. This determination depends totally upon whether the requirements of § 419A(c)(2) have been satisfied; i.e., whether assets have been accumulated in a reserve for the funding of designated post-retirement benefits.[7]

■ Having settled on the proper interpretation of § 419A(c)(2), we must now consider whether Parker has satisfied the statute's requirements. For the reasons set forth below, we find that Parker did not accumulate assets in "a reserve funded over the working lives of the covered employees...." 26 U.S.C. § 419A(c)(2). A consideration of all the relevant facts and circumstances supports this conclusion. First, in a letter to Ameritrust written only three days after the VEBA Trust was established, Parker's treasurer stated that the full amount of the 1987 contribution was expected to be depleted within twelve to eighteen months. Parker made a similar statement in its "Tax Matters" document for June 1987. This document stated that Parker expected that its entire contribution would be depleted within 14–18 months, "primarily through the payment of health care benefits for active employees." Indeed, the entire contribution was depleted by the second month of Parker's 1989 taxable year. Thereafter, Parker contributed to the VEBA through monthly payments that approximated the amount of benefits paid. The VEBA Trust's year-end balances for 1989 and 1990 were, in fact, zero.

Additionally, we note that Parker did not disclose the existence of the VEBA Trust to employees (except for those at work on its implementation), labor unions, retirees, or shareholders. In its annual reports for 1987, 1988, and 1989, Parker disclosed only that it had prefunded "certain future employee benefits"; it made no specific disclosure that it had prefunded the VEBA Trust. Nor did Parker's Form 1024 (Application for Recog-

---

**7.** Of course, any such contribution that is not currently deductible under § 419A(c)(2) would be allowable as a "qualified direct cost" for the year in which the benefits are paid. *See* 26 *U.S.C.* § 419(d).

nition of Exemption)·disclose the existence of a reserve.

A comparison of the disclosure statement contained in Parker's 1987 financial statement regarding the provision of health care and life insurance benefits with the examples of disclosure statements deemed appropriate in Financial Accounting Standards Board (FASB) Statement No. 81 (Disclosure of Post Retirement Health Care and Life Insurance Benefits) is also instructive. According to FASB, the following statement would be used when an employer annually funds benefits on the basis of estimated accruals:

> In addition to providing pension benefits, the company and its subsidiaries provide certain health care and life insurance benefits for retired employees. Substantially all of the company's employees, including employees in foreign countries, may become eligible for those benefits if they reach normal retirement age while working for the company. *The estimated cost of such benefits is accrued over the working lives of those employees expected to qualify for such benefits as a level percentage of their payroll costs.* Accrued costs are funded annually and were $XXX for 19X4. (emphasis added).

On the other hand, where an employer expenses benefit costs when paid, FASB provides the following illustrative disclosure:

> In addition to providing pension benefits, the company and its subsidiaries provide certain health care and life insurance benefits for retired employees. Substantially all of the company's employees, including employees in foreign countries, may become eligible for those benefits if they reach normal retirement age while working for the company. *The cost of retiree health care and life insurance benefits is. recognized as expense as claims are paid.* For 19X4, those costs totaled $XXX. (emphasis added).

Parker's 1987 statement is essentially the latter disclosure:

> In addition to providing pension benefits, the Company provides certain health care

and life insurance benefits for retired employees. Substantially all of the Company's employees may become eligible for those benefits if they become eligible for retirement while working for the Company. *The cost of retiree health care and life insurance benefits is recognized as expense as claims are paid. ...* (emphasis added).

This statement does not indicate that Parker prefunded post-retirement benefits but, rather, that it expensed benefits as they were paid.

Parker argues that the use of events in taxable years subsequent to the year in issue (e.g., consideration of statements from annual reports for later years) violates the annual tax accounting system. In particular, Parker contends that the deductibility of its 1987 contribution to the VEBA Trust must be judged solely by reference to events occurring on or before the end of June 30, 1987, the end of its fiscal year. Parker's argument is without merit, as the Supreme Court has held that the annual accounting principle is not breached by considering all relevant circumstances surrounding a transaction in order to classify that transaction properly for federal income tax purposes. *See Arrowsmith v. Commissioner,* 344 U.S. 6, 8, 73 S.Ct. 71, 72–73, 97 L.Ed. 6 (1952).[8]

We also reject Parker's argument that we have added unintended accounting and disclosure requirements to the statute by considering FASB's standards as well as the lack of notification provided by Parker to its employees and their unions. We have merely considered all the facts and circumstances in making a determination as to whether Parker established a "reserve funded over the working lives of the covered employees." 26 U.S.C. § 419A(c)(2). Our comparison of Parker's financial statements to the model forms provided by FASB and our consideration of Parker's overall lack of disclosure reinforce our conclusion in this case. However, like the Tax Court, we do not hold that the statute necessarily requires an employer

---

**8.** In any event, we note that Parker's "Tax Matters" document for the month of June · 1987 clearly indicates that Parker did not establish a reserve for the payment of post-retirement benefits. An examination of subsequent events merely confirms this.

to disclose the existence of an employee welfare benefit fund.

Finally, Parker contends that it should be permitted to take the deduction claimed, because the Treasury Department has failed to promulgate appropriate regulations to carry out the purposes of the statute, despite having the authority to do so pursuant to § 419A(i). Parker contends that "[t]he Treasury must not be allowed to profit from its own negligence." Parker's argument is mistaken. The statute is self-executing and sets forth the requirements that Parker must meet in order to claim a deduction for its contribution to the VEBA Trust. The absence of regulations, while not helpful, is beside the point. The statute exists, and we must interpret it as best we can.

We have considered Parker's remaining arguments and find them to be without merit. We hold that Parker is not entitled to deduct its contribution for post-retirement benefits in its 1987 taxable year. Accordingly, we **AFFIRM** the judgment of the Tax Court on this issue.

### IV.

The Tax Court also sustained the Commissioner's disallowance of the deduction claimed by Parker for its $3,210,000 contribution to the VEBA Trust for medical benefits for union members. Section 419A(f)(5)(A) provides that no account limit applies to a QAA for a *separate* welfare benefit fund that is maintained pursuant to a collective bargaining agreement. The Government argues that Parker is not entitled to a deduction, because it did not maintain a "separate" welfare benefit fund for its union employees. The VEBA Trust at issue here was not the result of collective bargaining, nor was it required by a collective bargaining agreement between Parker and the unions. Moreover, Mr. Dorn, Parker's director of taxation, conceded in his testimony at trial that Parker commingled the amounts contributed to the VEBA Trust for union medical benefits with the rest of the contributions.

On brief, Parker rejects the Government's interpretation of § 419A(f)(5). Parker contends that it is only necessary that the collective bargaining agreement require the employer to provide medical benefits to the employees covered by the agreement and that the employer do so through the use of a welfare benefit fund. In addition, Parker argues that the use of the word "separate" in § 419A(f)(5) requires only that the funds remain separate from Parker's general assets and beyond the reach of its creditors. Parker maintains that, in the instant case, "[t]here was no possibility that any of the funds could revert to Parker or that Parker's creditors could reach the funds contributed to the VEBA Trust for the union employees." Hence, in Parker's view, the deduction was appropriate.

We are unpersuaded. The plain language of the statute requires the maintenance of a separate welfare benefit fund for collectively bargained employees, one which is distinct and apart from any funds provided for non-collectively bargained employees. If Parker's construction were correct, the inclusion of the term "separate" would have been altogether unnecessary, as it would be mere surplusage. Parker's second argument would similarly strip the term "separate" in § 419A(f)(5) of any significance. Parker relies upon well established features of welfare benefit funds. Indeed, among the factors courts have traditionally used in analyzing the deductibility of an employer's contribution to a fund is whether the funds in a plan may ever revert to, or inure to the benefit of, the employer. *See, e.g., Greensboro Pathology Assocs., P.A. v. United States,* 698 F.2d 1196, 1201 (Fed.Cir.1982) ("Of course, in any instance where a company maintains total control of and retains all rights to the plan's funds, no deduction is allowed because the company has not in reality spent this money."); *Schneider v. Commissioner,* T.C. Memo.1992–24, 1992 WL 3359 ("an employer has not been permitted to deduct contributions to a plan when the degree of control which the employer retains over the plan is such that the employer does not actually relinquish control over the contributed funds and, thus, the rights purportedly conferred to its employees under the plan are 'illusory.' ") (internal citation omitted). What the statute requires is not simply separation from the employer and its creditors, but sep-

aration from any welfare benefit funds maintained for the employer's non-union employees as well. Parker has failed to make this showing.

■ Since Parker cannot avail itself of the safe harbor provision in § 419A(f)(5)(A), its contribution must satisfy the account limit rules in § 419A(c). Section 419A(c)(1)(A) provides that the account limit includes the amount reasonably and actuarially necessary to fund benefit claims which are incurred but unpaid as of the close of the taxable year, as well as related administrative expenses. Mr. Dorn testified at trial that Parker's contribution for the medical benefits of its union employees included amounts estimated to be incurred but unpaid *after* June 30, 1987, the close of Parker's taxable year. Mr. Dorn testified that Parker's $3,210,000 contribution represented amounts that Parker estimated would be paid out starting on July 1, 1987. On appeal, Parker attempts to salvage its deduction by arguing that the claims were incurred as of June 30, 1987, because Parker was obligated to pay out benefits under the terms of its collective bargaining agreements. Parker's argument misconstrues the meaning of the term "incurred." To be sure, Parker had a contractual obligation under the collective bargaining agreements with its union employees. However, no claims for union medical benefits existed as of June 30, 1987, and, therefore, Parker had incurred no liability as of that date. As the legislative history makes clear, "[c]laims are incurred only when an event entitling the employee to benefits, such as a medical expense, a separation, a disability, or a death actually occurs." H. Conf. Rept. No. 98–861, at 1156, U.S.Code Cong. & Admin.News 1984, p. 1844; *see also United States v. General Dynamics Corp.*, 481 U.S. 239, 243 n. 4, 107 S.Ct. 1732, 1737 n. 4, 95 L.Ed.2d 226 (1987) ("We conclude that, as a matter of law, the filing of a claim was necessary to create liability.").

Accordingly, the Tax Court's judgment disallowing Parker a deduction in its 1987 taxable year for its contribution of $3,210,000 for union medical benefits is **AFFIRMED.**

## V.

The final element of Parker's 1987 contribution at issue here is a $2.5 million contribution for long-term disability benefits. Parker argued that this contribution constituted an "addition to a qualified asset account," 26 U.S.C. § 419(c)(1)(B), which is includable in Parker's account limit for the year. The Tax Court disagreed and sustained the Commissioner's disallowance of Parker's deduction. The court noted that § 419A(a) defines a QAA to mean "any account consisting of assets set aside to provide for the payment of" certain specified benefits, including disability benefits. The court essentially interpreted the term "set aside" in § 419A(a) as having the same meaning as the term "reserve" in § 419A(c)(2). The Tax Court concluded that Parker "did not accumulate assets in the VEBA Trust for the payment of future long term disability benefits that were incurred but unpaid." *Parker–Hannifin Corp. v. Commissioner*, T.C. Memo. 1996–337, 1996 WL 412009. The court relied on the same facts that controlled its determination with respect to Parker's deduction for post-retirement benefits; e.g., Parker's general lack of disclosure regarding the VEBA Trust's existence, and Parker's internal memorandum from July 1987 which indicated that the VEBA Trust would be depleted within 12–18 months of its establishment.

■ We conclude that the Tax Court's interpretation of the term "set aside" in § 419A(a) was erroneous. We can find no basis in the text of the statute to support the Tax Court's construction of § 419A(a). We hold, on the basis of the plain meaning of the statute, that an employer has "set aside" assets for purposes of § 419A(a) when it makes an irrevocable contribution to a welfare benefit fund which provides those benefits specified in § 419A(a).[9] In addition, we note that the Tax Court relied incorrectly upon legislative history which explained that the intent of Congress in enacting §§ 419 and 419A was to prevent employers from taking premature deductions for expenses

---

**9.** The Commissioner has not challenged the deduction claimed by Parker for its contribution of $9,022,227 for incurred but unpaid medical, den-

tal, and short-term disability benefits. This is difficult to understand given the Government's interpretation of § 419A(a) in this case.

which have not yet been incurred. *See id.* (citing H. Conf. Rept. 98–861, at 1155). As Parker points out on brief, the Government entered into a pre-trial stipulation in this case in which it conceded that Parker's long-term disability claims were incurred but unpaid as of June 30, 1987. Thus, the concern expressed by Congress in this legislative history has no relevance in this case and should not serve to bar Parker from claiming a deduction to which it is otherwise entitled.

■ Given its disposition of the issue, the Tax Court did not reach the question of whether Parker's contribution for long-term disability benefits was reasonable. Section 419A(c)(1) provides that the account limit for a QAA for any taxable year includes the amount that is "reasonably and actuarially necessary" to fund claims which are incurred but unpaid, as well as any related administrative expenses. In 1986, Parker asked Terrence McManamon, a principal with the employee benefit compensation and actuarial consulting firm of William H. Mercer (Mercer), to perform calculations to quantify the disabled life reserve for long-term disability coverage for salaried and nonunion hourly employees (hereinafter the "1986 reserve amount"). Utilizing information provided by Parker, McManamon determined the net monthly and annual benefits payable to Parker's then currently disabled employees. McManamon then took into account offsets for assistance such as social security and worker's compensation. McManamon's calculations assumed that all currently disabled employees included in the calculation would continue receiving benefits until the age of 65; the calculations did not take into account the possibility that some employees might recover from their disability or that others might die before reaching 65. After receiving the 1986 reserve amount calculated by Mercer, Dorn reviewed how Parker's employees went on and came off disability. Dorn concluded that both occurrences were infrequent. As a result, Dorn determined that the 1986 reserve amount adjusted by

some factor would be acceptable as a 1987 reserve. Consequently, Dorn increased the reserve by 6 percent and arrived at a figure of $2.5 million. Mercer confirmed that 6 percent was a conservative factor to use in the adjustment, and Dorn then used the above $2.5 million figure as the amount of Parker's long-term disability reserve for purposes of determining Parker's 1987 contribution to the VEBA Trust.

Following our review of the Tax Court's factual findings and the record, we conclude that Parker's contribution of $2.5 million was "reasonably and actuarially necessary," 26 U.S.C. § 419A(c)(1), to fund Parker's long-term disability claims which were incurred but unpaid as of June 30, 1987.[10] Accordingly, we hold that Parker is entitled to a current deduction for this portion of its contribution to the VEBA Trust. The Tax Court's holding to the contrary is **REVERSED**.[11]

## VI.

For the foregoing reasons, we **AFFIRM** the Tax Court's decision sustaining the Commissioner's disallowance of a deduction for that portion of Parker's 1987 contribution attributable to post-retirement and union medical benefits, and **REVERSE** its decision sustaining the Commissioner's disallowance of a deduction for that portion of the 1987 contribution attributable to long-term disability benefits.

---

**10.** We note that the Government has not challenged on brief the reasonableness of this contribution.

**11.** Section 419A(c)(5)(B)(iv), enacted in 1984, directs the Secretary of the Treasury to promulgate *regulations establishing a safe harbor amount for* purposes of a contribution for long-term disability claims. No regulations have yet been issued.