GENERAL SIGNAL CORPORATION, and Subsidiaries, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Docket No. 97–4018.

United States Court of Appeals, Second Circuit.

Argued Dec. 11, 1997.

Decided April 24, 1998.

David J. Duez, Chicago, IL (Gregory G. Palmer, Courtney N. Stillman, McDermott, Will & Emery, of counsel), for Petitioners-Appellants.

Annette M. Wietecha, Attorney, Tax Division, Department of Justice, Washington, DC (Loretta C. Argrett, Assistant Attorney General, Kenneth L. Greene, Attorney, Tax Division, of counsel), for Respondent-Appellee.

(James A. Klein, Neil M. Grossman, Association of Private Pension and Welfare Plans, Washington, DC; James D. Holzhauer, Christine Lutgens, Timothy S. Bishop, Mayer, Brown & Platt, Chicago, IL), for Amicus Curiae Association of Private Pension and Welfare Plans.

Before: FEINBERG, OAKES and PARKER, Circuit Judges.

OAKES, Senior Circuit Judge:

General Signal Corporation ("General Signal") calculated its tax deductions for 1986 and 1987 based in part on contributions it made to a voluntary employees' beneficiary association ("VEBA"), a funded welfare bene-

fit plan ("fund") through which it provided benefits to its employees. The VEBA is a tax-exempt entity under I.R.C. § 501(c)(9). Sections 419 and 419A of the Tax Code outline the treatment of such funds for taxation purposes. *See* 26 U.S.C. §§ 419, 419A (1994). Certain contributions to such funds may be deducted from taxable income; § 419A(c)(2) provides the deductible contributions at issue in this appeal: "a reserve funded over the working lives of the covered employees and actuarially determined on a level basis . . . as necessary for" certain post-retirement benefits. We are asked to determine the meaning of the term "reserve" in this provision, i.e., whether it requires that funds contributed be intended actually to accumulate for the retirement benefits provided, in order to qualify as tax-deductible, or whether funds contributed according to the actuarial method provided may be deducted even if they are intended to be disbursed for other kinds of entitlements. We affirm the decision of the tax court that, in order for contributions to a "reserve" under § 419A(c)(2) to be tax deductible as within the account limit of § 419A(b), those contributions must be intended actually to accumulate for the purpose of funding post-retirement benefits.

## I. Background statutory provisions.

Section 419 provides the general rule that contributions made to a fund are not tax deductible but, if they would otherwise be deductible, they may be deducted under § 419 only in the taxable year in which they are paid, and subject to the limitation outlined in § 419(b). *See* 26 U.S.C. § 419(a) (1994). Section 419(b) limits the amount deductible under § 419 to the fund's "qualified cost" for the taxable year; the "qualified cost" generally includes the amount that would have been allowable as a deduction if provided directly by the employer, plus any addition to a "qualified asset account" for that year, minus the fund's after-tax income. *See* §§ 419(b), 419(c). A "qualified asset account" is "any account consisting of assets set aside to provide for the payment of disability benefits, medical benefits, supplemental unemployment benefits or severance pay benefits, or life insurance benefits."

§ 419A(a). A qualified asset account may not exceed the "account limit" set out in § 419A(c), as "the amount reasonably and actuarially necessary" to fund incurred but unpaid claims and administrative costs with respect to such claims. However, the "account limit" "may include a reserve funded over the working lives of the covered employees and actuarially determined on a level basis . . . as necessary for" post-retirement medical or life insurance benefits to be provided to covered employees. *See* § 419A(c)(2).

This last provision, § 419A(c)(2), therefore creates an exception to the general rule that contributions may only be deducted in the year actually paid to employees. Contributions to a qualified asset account may include a "reserve" fund for post-retirement benefits, which are deductible when made, and before the post-retirement benefits are actually paid out or even incurred as liabilities. The parties thus dispute the requirements of a "reserve" as provided in this section.

## II. Facts

General Signal, a New York corporation, employs about twenty thousand people, and traditionally provided both active and retired employees with medical and life insurance benefits. General Signal established the VEBA by agreement with Chase Manhattan Bank, N.A., as trustee, effective December 1, 1985, exclusively to provide welfare benefits to active and retired employees and their dependents, and reasonable administration expenses. The trust agreement provided that all assets of the trust were to be administered as a commingled fund and that no participant, beneficiary, or dependent would have legal or equitable right arising from the VEBA or any direct interest in any specific asset of the VEBA. *General Signal Corp. v. Commissioner of Internal Revenue*, 103 T.C. 216, 220, 1994 WL 450465 (1994). The trust agreement provided that there was no guarantee that the assets of the VEBA would be sufficient to pay any benefit to any person. *Id.* During 1986 and 1987, General Signal used the VEBA to fund approximately ninety percent of General Signal's total costs of providing medical and life insurance benefits.

General Signal claimed a deduction of $39,-067,195 on its 1986 tax return, $35,302,354 of which it claimed as funding a "reserve" under § 419A(c)(2). On its 1987 tax return, General Signal claimed a deduction of $40,-204,000 for contributions made to the VEBA; $39,981,437 of this amount it claimed as funding the reserve. General Signal claims it calculated the reserve contributions according to § 419A(c)(2), but spent the contributions largely on other claims for benefits made by active employees. "[A]t least $45,-700,000 (72 percent) of the contributions alleged to be attributable to accrued retiree liabilities was used to pay active employee benefits during 1987 and 1988. Additionally, the balance remaining in the VEBA trust as of the end of its fiscal year 1988 . . . [was] almost completely depleted by the end of its fiscal year 1989." *General Signal*, 103 T.C. at 238. General Signal does not claim to have intended that the funds be set aside for the post-retirement benefits; as it stated to the tax court, "It was never intended nor represented that any portion of any VEBA contribution would be spent in any particular way, other than to provide permitted benefits as expenses were incurred." *General Signal*, 103 T.C. at 239.

### III. Discussion.

 The tax court held the amount General Signal deducted as a contribution to the "reserve" to be a deficiency, because General Signal never intended to create a reserve and never did so. *Id.* at 246. General Signal argues that this reading of "reserve funded

over the working lives of covered employees" in § 419A(c)(2) ignores what it claims to be the actuarial sense of the word "reserve," as a quantity of liability. It claims that the rule serves only to guide General Signal's actuary in calculating what funds may be deducted if contributed to the VEBA, and imposes no requirement with respect to whether those funds be intended to accrue over time, or whether they may be intended to be spent on benefits to active employees for which 419A otherwise permits the fund to be used. The Commissioner argues that contributions made as part of a reserve under § 419A(c)(2) may only be deducted from taxable income if the taxpayer intends that the funds actually accumulate for the purpose of providing future benefits to retired employees.[1] Only one other court of appeals has visited this issue, and has found, as we do, that in order to claim contributions to a "reserve" under § 419A(c)(2), those contributions must accumulate for the payment of post-retirement medical and life insurance benefits. *See Parker–Hannifin v. Commissioner of Internal Revenue*, 139 F.3d 1090, 1097 (6th Cir.1998).

Each side claims the support of the plain language of the statute. The Commissioner's reading of § 419A(c)(2) finds strong support in the legislative history of the section at issue. However, General Signal argues that the Commissioner's interpretation of the term is unworkable and will create uncertainty because that interpretation implies a requirement that a taxpayer have a specific intent with respect to its contributions, and because it creates a situation in

---

1. The Commissioner does not claim that her interpretation is entitled to deference. An agency interpretation of a statute is not entitled to deference when the agency's position is a post hoc rationalization advanced in litigation to defend its action against attack. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213, 109 S.Ct. 468, 474, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.") However, the Court recently held that an agency's interpretation advanced only in an amicus brief was entitled to deference, where "[t]here is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer v. Robbins*, 519 U.S. 452, ——, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997). The D.C. Circuit recently applied this holding

though in a case against the IRS, where the main source of the IRS's interpretation of the statute at issue was found in its appellate brief. "One might consider the interpretation of § 6103 reflected in the IRS's argument to be merely a litigating position. But that would not necessarily preclude our deferring to the agency's interpretation so long as it represented the IRS's 'fair and considered judgment on the matter.'" *Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C.Cir.1997) (quoting *Auer*, 519 U.S. at ——, 117 S.Ct. at 912).

Because we find that the Commissioner's interpretation of the statute is not only permissible but required by the statute's language and legislative history, we need not determine whether we should accord deference to the Commissioner's interpretation even though we find it in the context of her litigating position.

which tax deductions that are valid when made are made invalid by subsequent events, such as the spending down of assets in a particular fund. Taxpayers will not be able to predict whether their contributions are deductible, if they are uncertain what will happen to the money in their funds in future years and the permissibility of the deduction depends upon the fund remaining intact. General Signal argues that, given these problems, the Commissioner's interpretation creates a requirement that a *fund* maintain a minimum balance, as well as separate accounting for reserves established under § 419A(c)(2), while the statute does not appear to contemplate either a minimum balance or separate accounting. Congress explicitly required segregated accounts for retiree benefits for key employees, but omitted to do so with respect to § 419A(c)(2).

"In interpreting a provision of the I.R.C., we look to the ordinary, everyday sense of the words used." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1465 (2d Cir. 1993). Section 419A(c)(2) reads, "The account limit for any taxable year may include a reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for" post-retirement medical and life insurance benefits. We find that the language "funded over the working lives of the covered employees" clearly evokes gradual accumulation of funds measured with an eye toward complete funding at the time of retirement, as the Commissioner urges. *See Parker–Hannifin,* 139 F.3d at 1094. General Signal argues that its reading of "reserve" as an unfunded liability is equally consistent with the language "funded over the working lives of covered employees," because that language instructs actuaries what percentage of its *future* liability *for* retired employees it may contribute in a given year without exceeding the deductible limit. "[F]unded over the working lives" tells the actuary to proportion the contribution for each employee according to the number of remaining years of service of each employee, as opposed to the years of the employee's entire life, for example. This argument treats "over the working lives" as an arbitrary variable.

Congress may have chosen as an alternative to require that the contribution be rated over the total lives, or any other period. While this argument is not implausible, the Commissioner's reading of the language strikes us as a good deal more reasonable. Under the Commissioner's reading, the amount that is supposed to be added to the reserve each year would, assuming the reserve remained intact, result in full funding for retirement benefits at the end of each employee's term of service. This reading thus explains not only the meaning of the language, but provides a sensible reason that Congress would have selected it.

To support our conclusion that the statutory language requires actual accumulation of funds in a reserve, we consult the legislative history of the statute, which indicates that Congress envisioned reserves under § 419A(c)(2) to accumulate funds and intended the statute to prevent companies from taking deductions for benefits before liabilities are incurred. General Signal presents strong arguments that the tax court's ruling will be unworkable in practice, but these arguments fail to override Congress's expressions of its intent. The House Conference Report relating to §§ 419 and 419A provides as follows:

*Prefunding of life insurance, death benefits, or medical benefits for retirees.* The qualified asset account limits allow amounts reasonably necessary to *accumulate* reserves under a welfare benefit plan so that the medical benefit or life insurance (including death benefit) payable to a retired employee during retirement is *fully funded upon retirement.* These amounts may be *accumulated no more rapidly* than on a level basis over the working life of the employee. . . . The conferees intend that the Treasury Department prescribe rules requiring that the funding of retiree benefits be based on reasonable and consistently applied actuarial cost methods, . . . and be no more *rapid* than on a level basis over the remaining working lifetimes of the current participants (reduced on the basis of reasonable turnover and mortality assumptions).

H.R. Conf. Rep. No. 98–861, at 1157 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 1845 (emphasis added). This report, referring to contributions that "accumulate" so that retirement benefits may be "fully funded upon retirement," indicates that Congress envisioned actual accumulation of funds when it created the option of deducting contributions to a reserve for post-retirement benefits. Furthermore, the use of the words "rapid" and "rapidly" with respect to the funding belies General Signal's argument that "over the working lives" is language included only to determine a calculation, since that interpretation would give rise to no accumulation at any speed.

The House Conference Report also states, under the heading "Definition of the welfare benefit fund," over which the Department of the Treasury may exercise regulatory authority, *see* 26 U.S.C. § 419(e)(3)(C),

> [i]n prescribing regulations relating to the definition of the term "fund," the conferees wish to emphasize that the principal purpose of this provision of the bill is to prevent employers from taking premature deductions, for expenses which have not yet been incurred, by interposing an intermediary organization which holds assets which are used to provide benefits to the employees of the employer.

H.R. Conf. Rep. No. 98–861, at 1155 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 1843.

General Signal points out that either definition of the term "reserve" will allow employers to take a deduction for post-retirement benefits before the cost of the benefits are incurred, and that the tax court's definition actually will result in greater tax-free accumulation than if the contributions are allowed to be spent on other claims for benefits. However, General Signal's proposed reading of the term allows a taxpayer to take a deduction specifically for retirement benefits that are never paid to the employee to whom the deduction corresponds, but instead may fund other employees' benefits in the following year that would otherwise not be deductible until paid. In enacting §§ 419 and 419A, Congress appeared to want to avoid having employers take deductions for benefits to active employees before the cost

of the benefits are incurred, and to create a specific, narrow exception to allow a company to elect to accumulate funds set aside for retirement benefits. *See Parker–Hannifin*, 139 F.3d at 1096. General Signal's reading of § 419A(c)(2) allows this exception to overcome the general rule of § 419(a), that contributions are only deductible in the year in which paid, and creates a back door through which to deduct in advance contributions that are effectively made for payment of benefits to active employees. *Id.* The Commissioner's reading preserves the general rule that contributions to the VEBA are not deductible until paid out to employees or made available to be paid out.

That the Commissioner's reading of § 419A(c)(2) creates an issue regarding the intent of a taxpayer does not convince us it is incorrect; where there is the possibility that a deduction is taken based on a "sham" transaction, questions of intent properly bear upon the lawfulness of that deduction. In *Jacobson v. Commissioner of Internal Revenue*, 915 F.2d 832 (2d Cir.1990), we held that a transaction can be determined to be a sham where the transaction has no practicable economic effects other than the creation of income tax losses. " 'A transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions.' " *Id.* at 837 (quoting *DeMartino v. Commissioner of Internal Revenue*, 862 F.2d 400, 406 (2d Cir.1988)). General Signal argues that it passes this test, because it has "demonstrated its non-tax avoidance objectives in establishing and providing benefits through the VEBA sufficient to defeat any such allegation." This argument assumes what it is trying to prove, however, that the word "reserve" does not actually refer to withheld assets. If "reserve" does refer to an actual fund of assets, then General Signal's claimed tax deduction for funds donated to a reserve would certainly fit the definition of a sham, because the "reserve" would never exist as an actual fund of assets set aside for retirement benefits. Therefore, General Signal's intent not to create the reserve would be a perfectly valid basis for finding a violation. Under the Commissioner's reading of the term, the reserve to which General Signal made dona-

tions and claimed corresponding tax deductions is fictitious and has no business purpose besides tax savings.

Whether deductions may be claimed under § 419A(c)(2), therefore, properly turns on the intent of General Signal in establishing its reserve. This disposes of General Signal's argument that the requirement of an actual reserve fund creates uncertainty because events subsequent to the deduction could invalidate a deduction lawful at the time it was made, in violation of the principle of annual accounting. The intent of General Signal at the time of the contribution is the relevant determination; that intent is not subject to change. Later depletions of a fund may serve as evidence of what a taxpayer's intent may have been, but depletions will not themselves render invalid deductions made for contributions to a fund established to accumulate assets for retirement benefits. *See ParkerHannifin*, 139 F.3d at 1098 n. 8. This lays to rest General Signal's concern that it could not claim deductions under § 419A(c)(2) without the fear of being required to make consistent contributions annually into the indefinite future, and that the fund must therefore be subject to a minimum balance. While our reading of the statute does imply a commitment to establish funding through the working lives of covered employees, if subsequent events rendered maintenance of the reserve impossible, evidence of the reason for discontinuing or spending down the reserve could be presented in response to any accusation that a taxpayer never intended a reserve to be established in the first place.

General Signal also argues it will be required to maintain a separate account for contributions for retirement benefits, not specifically provided for in the statute, because not creating a separate account would create fiduciary conflicts in the trustee, which is not supposed to favor any group ·of claimants over the other. It argues that if Congress had meant to require setting up separate accounts, it would have done so explicitly, as it did for retiree benefits for highly compensated employees. *See* 26 U.S.C. § 419A(d). However, it is not necessarily true that General Signal would be forced to set up a separate account for the retiree benefits reserve if it chose to make a reserve under § 419A(c)(2), and Congress may have chosen not to require it to do so because it did not want to prohibit interest earned by the reserve from benefitting other kinds of claimants. General Signal also claims that the VEBA is supposed to benefit all beneficiaries equally, so if claims are made on the assets by current employees, the trustee would violate its fiduciary responsibility to withhold benefits in favor of retirees. The only authority General Signal cites for this "principle of fungibility" that would place it or the trustee in such a bind is that the terms "account" and "fund" are singular in the statute, while the benefits referred to are plural. We do not agree that the number of these nouns creates the requirement that the trustee may not set aside certain funds within the VEBA for future benefits for retired employees. The case General Signal cites for the proposition that the trustee may not set aside funds for retirees within the VEBA involved an ERISA trustee who owed fiduciary obligations to members of one plan that was reorganized into two. *John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir.1994). During the period of transition from one fund to two, the trustee allocated to the parent plan interest earned by the funds of the "spinoff" plan; the court found this allocation to violate the trustee's fiduciary duty. *Id.* The case does not hold, however, that funds deposited specifically for retiree benefits may not accrue specifically toward providing those benefits. We have been shown no reason that, if a taxpayer elects to claim deductions under § 419A(c)(2), it cannot provide as part of the trust agreement that its contributions to a reserve for post-retirement benefits are to be set aside for retiree beneficiaries. Such earmarking would not place other beneficiaries at a disadvantage, because presumably the funds would not have been contributed in the first place if they were not deductible as a reserve for retiree benefits.

**IV. Conclusion.**

■ Many of the administrative problems General Signal complains of may result more

from the Treasury Department's failure to promulgate rules respecting administration of reserves funded under § 419A(c)(2) than from a flawed reading of the statute itself. We will not read a law contrary to Congress's intent only to accommodate an agency's failure to promulgate rules that would make the intended requirements of the statute easier to administer. *See Parker–Hannifin*, 139 F.3d at 1098. We thus agree with the Sixth Circuit in *Parker–Hannifin, supra.*

For the above reasons, the decision of the tax court is affirmed.