120 T.C. No. 5

UNITED STATES TAX COURT

WELLS FARGO & COMPANY (f.k.a. NORWEST CORPORATION) AND
SUBSIDIARIES, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 7620-98, 12136-98,    Filed February 13, 2003.
            19891-98, 7282-99,
            12484-99.[1]

        For the years 1991-94, Ps made contributions to a
voluntary employee benefit trust (the postretirement
medical trust) for the purpose of providing
postretirement medical benefits to their employees. For
1991, Ps' actuary computed the present value of future
postretirement medical benefits for active employees to
be $14,096,473 and for retired employees to be
$27,759,057. The actuary divided the $14,096,473 for
active employees by the average actuarial present value
of future service to produce a 1991 funding amount of
$2,930,660 for active employees. The actuary determined
that the $27,759,057 for retired employees could be fully
funded in 1991.  Ps contributed $30,689,717 to the

---

[1]    These cases have been consolidated for trial, briefing,
and opinion solely with respect to the issue involved herein.

postretirement medical trust in 1991 and, on Ps' consolidated return for 1991, claimed a deduction for the contribution as an addition to a "qualified asset account" pursuant to sec. 419A(b), I.R.C.

R determined that Ps' method for computing the 1991 contribution for postretirement benefits for retirees was improper and resulted in a contribution that exceeded the account limit for a reserve under sec. 419A(c)(2), I.R.C. R further determined deficiencies for years 1992-94 as a result of the determined overfunding in 1991.

Held, with respect to an employee who is retired when the reserve is created, the present value of that employee's projected benefit may be allocated to the year the reserve is created. Accordingly, Ps' contributions to the postretirement medical trust for 1991 did not cause the qualified asset account to exceed the account limit under sec. 419A(b), I.R.C., with respect to the reserve for postretirement medical benefits provided in sec. 419A(c)(2), I.R.C.

Walter A. Pickhardt, Mark A. Hager, and Andrew T. Gardner, for petitioners.

Alan M. Jacobson, Randall P. Andreozzi, Christa A. Gruber, and James S. Stanis, for respondent.

## Contents

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.   Background . . . . . . . . . . . . . . . . . . . . . . . . . 5

B.   Norwest's Welfare Benefit Plans . . . . . . . . . . . . . . 6

C.   Financial Accounting Standards Board Statement of Financial Accounting Standards No. 106 . . . . . . . . . . 8

D.   Norwest's Contributions to the Postretirement Medical Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
     1.   Funding the Postretirement Medical Trust for 1991 . 11

2. Funding the Postretirement Medical Trust for 1992-94 . . . . . . . . . . . . . . . . . . . . 12
3. Mercer's Actuarial Assumptions for the 1991-94 Contributions to the Postretirement Medical Trust . 13
4. Contributions to the Postretirement Medical Trust . 15

E. Respondent's Determinations . . . . . . . . . . . . . . . 15

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A. Statutory Framework:  Sections 419 and 419A . . . . . . 15

B. Method for Computing the Account Limit With Respect to a Reserve . . . . . . . . . . . . . . . . . . . . . . . . 17
1. Actuarial Cost Methods . . . . . . . . . . . . . . 18
a. Aggregate Cost Method . . . . . . . . . . . 20
b. Entry Age Normal Cost Method . . . . . . . . 20
c. Individual Level Premium Cost Method . . . . . 21
2. Computations by the Experts . . . . . . . . . . . 22
a. Mr. Cohen . . . . . . . . . . . . . . . . . 22
b. Mr. Scharmer . . . . . . . . . . . . . . . . 23
c. Mr. Daskais . . . . . . . . . . . . . . . . 25
3. Positions of the Parties . . . . . . . . . . . . . 33
4. Statutory Construction . . . . . . . . . . . . . . 34
5. The Statute . . . . . . . . . . . . . . . . . . . 35
a. Reserve . . . . . . . . . . . . . . . . . . 36
b. Reserve Funded Over the Working Lives of the Covered Employees and Actuarially Determined on a Level Basis . . . . . . . . . . . . . . . 39
(i) Reserve Funded Over the Working Lives of the Covered Employees . . . . . . . . . . 40
(ii) Reserve Actuarially Determined on a Level Basis . . . . . . . . . . . . . . . . . . 46

C. Investment Rates . . . . . . . . . . . . . . . . . . . 51

JACOBS, Judge:  Respondent determined deficiencies in Federal income tax and accuracy-related penalties with regard to petitioners' consolidated returns for 1990-94 as follows:

|       |             | Addition to Tax |
|-------|-------------|-----------------|
| Year  | Deficiency  | Sec. 6662(a)    |
| 1990  | $52,073,344 | $5,161,509      |
| 1991  | 216,338,093 | 23,353,180      |
| 1992  | 417,310,889 | 1,047,868       |
| 1993  | 86,406,356  | 5,655,276       |
| 1994  | 62,493,719  | 5,135,972       |

Numerous issues have been raised as a consequence of respondent's determinations; many of these issues heretofore have been resolved. The issue to be decided herein concerns the amounts petitioners may deduct for years 1991-94 for contributions made to a voluntary employee benefit association (VEBA) trust to provide postretirement medical benefits to covered employees and their eligible dependents. To determine the allowable amounts, we first must decide the proper method to be used in computing the reserve under section 419A(c)(2).[2] Then we must decide whether petitioners used reasonable investment rates in their actuarial computations.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulations of facts and the attached exhibits are incorporated herein by this reference.

---

[2] All section references are to the Internal Revenue Code as in effect for the years in issue.

A.  Background

Norwest Corp.[3] (Norwest) is a multibank holding company organized in 1929.  It owns substantially all of the outstanding capital stock of numerous commercial banks in Minnesota, Iowa, South Dakota, Nebraska, Wisconsin, North Dakota, Montana, Wyoming, Illinois, Indiana, and Arizona.  Norwest also owns subsidiaries engaged in various businesses related to banking, principally mortgage banking, equipment leasing, agricultural finance, commercial finance, consumer finance, securities dealings and underwriting, insurance agency services, computer and data processing services, corporate trust services, and venture capital investments.  For each of the years at issue, Norwest and its subsidiaries filed consolidated Federal income tax returns.

On November 2, 1998, Wells Fargo & Co. was merged into a wholly owned subsidiary of Norwest.  Simultaneously with the merger, Norwest changed its name to Wells Fargo & Co.  Hereinafter, reference to Norwest is to Norwest and its subsidiaries before the merger with Wells Fargo & Co.

When Norwest filed the petitions in docket Nos. 7620-98 and 12136-98 (which was before the merger), its principal place of business was in Minneapolis, Minnesota.  At the time Wells Fargo & Co. filed the petitions in docket Nos. 19891-98, 7282-99, and

---

[3]    Norwest  Corp.  was  formerly  known  as  Northwest Bancorporation.

12484-99 (which was after the merger), its principal place of business was in San Francisco, California.

B.   <u>Norwest's Welfare Benefit Plans</u>

On January 1, 1930, Norwest established the Norwest Corp. Medical Plan, also known as the Norwest Corp. Hospital-Medical Plan (the medical plan).  The medical plan is a self-insured welfare plan providing for the payment (or reimbursement) of all or a portion of covered medical expenses incurred by Norwest's eligible employees (including eligible retired employees) and their eligible dependents.  Since June 1, 1957, the medical plan has provided postretirement medical benefits (i.e., medical benefits for its retirees), pursuant to a rider issued by Prudential Insurance Co. of America, relating to Norwest's group health insurance policy.

Over the years, Norwest established other plans, in addition to the medical plan, to provide benefits for Norwest's eligible employees (including under some plans retired employees) and their eligible dependents.  The employee benefit plans include a long-

term disability plan,[4] a dental plan,[5] a severance plan,[6] an HMO premium plan,[7] and a choice plus medical plan.[8]

On November 11, 1978, Norwest established, effective January 1, 1979, a VEBA trust, under section 501(c)(9), to fund the employee benefit plans then in existence (i.e., the medical plan and the long-term disability plan). This trust was originally called the "Northwest Bancorporation Employee Benefit Trust" and is hereinafter referred to as the master trust. Over the years, the master trust was amended to fund the dental plan and the HMO

---

[4] On Aug. 1, 1969, Norwest established the Norwest Corp. Long-Term Salary Continuation Plan (now known as the Norwest Corp. Long-Term Disability Plan) (the long-term disability plan). The long-term disability plan is a combination self-insured/insurance welfare benefit plan providing monthly disability income benefits for eligible disabled employees.

[5] On Jan. 1, 1980, Norwest established the Norwest Corp. Dental Plan (the dental plan). The dental plan is a combination self-insured/insured welfare benefit plan providing for the payment or reimbursement of all or a portion of covered dental expenses.

[6] The Norwest Corp. Severance Pay Plan is a self-insured welfare plan providing for the payment of severance benefits for Norwest's eligible employees.

[7] Norwest established the Norwest Corp. HMO Premiums Plan, an insured welfare benefit plan providing for the payment or reimbursement of all or a portion of covered medical expenses.

[8] Norwest established the Norwest Corp. Choice Plus Plan (the choice plus medical plan), effective Jan. 1, 1993, which was funded by the master trust. The choice plus medical plan is a self-insured welfare plan providing for the payment or reimbursement of all or a portion of covered medical expenses.

premium plan.  The master trust was amended and restated effective January 1, 1991; the name of the master trust was changed to the Norwest Corp. Employee Benefit Trust.

C.    Financial Accounting Standards Board Statement of Financial Accounting Standards No. 106

From 1957 to 1991, Norwest paid medical benefits for retired employees as claims were submitted; i.e., on a "pay-as-you-go" basis.    For financial accounting and tax purposes, Norwest recognized these costs when the benefits were paid.

In 1990, new financial accounting rules for nonpension, postretirement benefits were promulgated in Statement of Financial Accounting Standards No. 106 (SFAS 106).  Pursuant to SFAS 106, for financial accounting purposes, employers must accrue (during the employment of an employee) the cost of future health care benefits to be paid to the employee after retirement.[9]  Thus, because SFAS 106 applies to a postretirement benefit plan regardless of the means or timing of funding, the employer cannot postpone recognition of the cost of the employee's postretirement benefit by contributing at the time of retirement a lump sum equal to the

---

[9]    "Attribution period" is the period of an employee's service to which the expected postretirement benefit obligation for that employee is assigned.    Generally, the beginning of the attribution period is the employee's date of hire and the end of the attribution period is the employee's full eligibility date.  An equal amount of the expected postretirement benefit obligation is attributed to each year.

present value of the employee's benefit (terminal funding).  SFAS 106, par. 8.

SFAS 106 permits an employer to immediately recognize, at the date of initial application of SFAS 106, obligations that the employer had not accrued for financial purposes in prior years (transition obligation[10]).   SFAS 106, par. 260.   Immediate recognition is not permitted after the initial application of SFAS 106.[11]

Norwest adopted SFAS 106, effective January 1, 1992.  As a

---

[10]     The transition obligation recognized upon initial application of SFAS 106 does not include "(a) any previously unrecognized post-retirement benefit obligation assumed in a business combination accounted for as a purchase, (b) a plan initiation, and (c) any plan amendment that improved benefits, to the extent that those events occur after the issuance of * * * [SFAS 106]."  SFAS 106, par. 261.

[11]     The Financial Accounting Standards Board concluded that to permit immediate recognition at any subsequent time would result in too much variability in financial reporting for a long period of time.

consequence, Norwest elected to recognize as an immediate expense its unrecognized transition obligation.[12] The amount of this obligation was $71.7 million (after tax).

On December 20, 1991, Norwest established the Norwest Corp. Employee Benefit Trust for Retiree Medical Benefits (the postretirement medical trust), effective December 16, 1991.[13] The postretirement medical trust funded postretirement medical benefits to be provided to all employees, both active and retired (other than "key employees"), under Norwest's medical plan. Simultaneously with the creation of the postretirement medical trust, Norwest amended the master trust, effective December 16, 1991, to eliminate the master trust's responsibility to pay postretirement medical benefits for all but key employees.

---

[12] SFAS 106, par. 518, defines an "unrecognized transition obligation" as the unrecognized amount, as of the date SFAS 106 is initially applied, of "(a) the accumulated post-retirement benefit obligation in excess of (b) the fair value of plan assets plus accrued post-retirement benefit cost or less any recognized prepaid post-retirement benefit cost." "Accumulated post-retirement benefit obligation" is defined by SFAS 106, par. 518, as the actuarial present value of benefits attributed to employee service rendered to a particular date. Since Norwest historically had neither paid nor deducted the benefits until incurred, the unrecognized transition obligation was equal to the accumulated postretirement benefit obligation.

[13] Effective Jan. 1, 1991, Norwest also established a separate VEBA trust to fund the liabilities for the severance plan. By an amendment to the master trust, effective Jan. 1, 1993, Norwest merged the severance plan into the master trust.

D.  Norwest's Contributions to the Postretirement Medical Trust

For the years 1991-94, Norwest made contributions to the postretirement medical trust for the purpose of providing postretirement medical benefits.

1.  Funding the Postretirement Medical Trust for 1991

During the years at issue, William M. Mercer, Inc. (hereinafter referred to as Mercer), a national actuarial firm, prepared actuarial funding valuations for Norwest's pension plans and postretirement medical plans. Sometime in late 1990/early 1991, Norwest expressed to Mercer an interest in funding its retiree medical benefits plan. Norwest understood that employers were permitted a tax deduction for funding a reserve for postretirement medical benefits.

On April 14, 1992, Mercer prepared and presented to Norwest a valuation report entitled "Norwest Corporation Actuarial Funding Valuation of the Post-retirement Medical Plans as of January 1, 1991" (the 1991 valuation). Mercer computed the present value of future medical benefits to be $14,096,473 for active employees and $27,759,057 for retired employees. In determining these computations, Mercer used a pretax investment rate assumption of 9 percent and an after-tax investment rate of 5.5 percent. Mercer divided the $14,096,473 for active employees by the "average actuarial present value of future service" for the active employees (4.81) to produce a 1991 funding amount of $2,930,660 for active

employees.  Mercer determined that, because the retired employees had no remaining working life, the present value of future benefits for retired employees ($27,759,057) could be funded in 1991. Mercer believed that Norwest's resulting reserve for active and retired employees ($30,689,717) would be within the section 419A(c)(2) account limit.

On the basis of the 1991 valuation report, Norwest contributed $30,689,717 to the postretirement medical trust in 1991.  On the consolidated return for 1991, Norwest claimed a deduction for the contribution as an addition to a "qualified asset account" pursuant to section 419A(b).

2.   Funding the Postretirement Medical Trust for 1992-94

At the request of Norwest, Mercer prepared actuarial funding valuation reports as of January 1 for each year 1992-94, relating to the funding of the postretirement medical trust (the 1992-94 valuation reports).  In the 1992-94 valuation reports, Mercer computed the end-of-year contributions to be $6,859,600, $11,308,043, and $12,247,933, respectively. Mercer calculated the contribution amount to be equal to a fraction.  The numerator of the fraction was the present value of future benefits for active employees and retirees, reduced by the sum of the value of (a) the postretirement medical trust assets and (b) the section 401(h) account assets.  The denominator of the fraction was the average present value of future working lifetimes of the employees.  The

present value of the future working life of an employee is comparable to the present value of an annuity (computed with the actuarial interest rate used by the plan) that pays $1 each year until the employee is expected to retire.

3.  Mercer's Actuarial Assumptions for the 1991-94
    Contributions to the Postretirement Medical Trust

In order to compute the present value of future benefits in the 1991-94 valuation reports, Mercer made certain actuarial assumptions, including investment rates, the number of employees who would "retire, die, terminate their services or become disabled, their ages at termination, and their expected benefits." Mercer requested Norwest to provide an estimate of Norwest's effective tax rates for years 1991-94. Norwest advised Mercer that those tax rates would be approximately 39 percent in 1991-92 and 40 percent in 1993-94.

The pretax and after-tax investment rates Mercer used in the 1991-94 valuation reports were as follows:

|                          | 1991  | 1992  | 1993  | 1994  |
|--------------------------|-------|-------|-------|-------|
| Pretax investment rate   | 9.00% | 8.00% | 6.00% | 6.00% |
| After-tax investment rate | 5.50  | 4.90  | 3.60  | 3.60  |

The following chart illustrates the various factors disclosed in the 1991-94 valuation reports (minor computational discrepancies are unexplained):

|  | Valuation Date | | | |
|---|---|---|---|---|
|  | 1/1/91 | 1/1/92 | 1/1/93 | 1/1/94 |
| 1. Actuarial present value of projected benefits | | | | |
| Active employees | $13,361,586 | $38,521,857 | $62,860,146 | $83,594,015 |
| Retired employees | 26,311,902 | 36,694,928 | 47,731,960 | 48,947,859 |
| Total | 39,673,488 | 75,216,785 | 110,592,106 | 132,541,874 |
| 2. Actuarial value of assets | | | | |
| VEBA | -0- | 30,736,554 | 30,176,217 | 39,940,676 |
| 401(h) | -0- | 1,125,467 | 1,172,269 | 7,598,653 |
| Total | -0- | 31,862,021 | 31,348,486 | 47,539,329 |
| 3. Actuarial present value of future normal costs [1-2][1] | 13,361,588 | 43,354,764 | 79,243,620 | 85,002,545 |
| 4. Actuarial present value of future service | 4.81 | 6.63 | 7.26 | 7.19 |
| 5. Normal cost at beginning of year [3/4] | 2,777,877 | 6,539,180 | 10,915,099 | 11,822,329 |
| 6. Maximum contribution[2] | | | | |
| a. Paid at beginning of year | 29,089,779 | 6,539,180 | 10,915,099 | 11,822,329 |
| b. Interest to yearend | 1,599,938 | 320,420 | 392,944 | 425,604 |
| c. Paid at yearend [a + b] | 30,689,717 | 6,859,600 | 11,308,043 | 12,247,933 |

[1]    In 1991, this is the present value of active benefits only, excluding the 1991 net benefit costs.

[2]    In 1991, this includes the normal cost for active participants, plus the entire present value for those retired as of Jan. 1, 1991, excluding the retirees' 1991 net benefit costs.

4.    Contributions to the Postretirement Medical Trust

In 1991-94, Norwest made contributions to the postretirement medical trust of $30,689,717, $2,170,000, $13,791,600, and $12,247,933, respectively.    During 1992-94, Norwest's retired employees made contributions to the postretirement medical trust of $473,832.62, $736,176.25, and $784,906.22, respectively.    In 1993, $175,216 was transferred from the master trust to the postretirement medical trust.

E.   Respondent's Determinations

Respondent determined that Norwest's method for computing the 1991 contribution for postretirement benefits for retirees was improper and resulted in a contribution that exceeded the account limit for a reserve under section 419A(c)(2).    As a result of the 1991 overfunding, respondent determined that the reserve was also overfunded in 1992-94.

OPINION

A.    Statutory Framework:   Sections 419 and 419A

Sections 419 and 419A limit deductions for contributions made by a taxpayer to an employee welfare benefit fund.[14]    In general, section 419(a)(1) denies a deduction for contributions paid or accrued by an employer to a welfare benefit fund.    However, if the contributions would otherwise be deductible, then section 419(a)(2)

---

[14]    For purposes of secs. 419 and 419A, a welfare benefit fund includes a VEBA that is exempt from taxation under sec. 501(c)(9).

permits a deduction for the taxable year in which the contribution is paid, subject to the limitation contained in section 419(b).

Section 419(b) limits the deduction for any taxable year to the welfare benefit fund's "qualified cost".[15] The fund's qualified cost is equal to the sum of the fund's "qualified direct cost" for the year, and, subject to the limitation of section 419A(b), any addition to a "qualified asset account" for the year.[16] Sec. 419(c)(1).

Section 419A(a) defines a qualified asset account as any account consisting of assets set aside to provide for the payment of (1) disability benefits, (2) medical benefits, (3) SUB (supplemental compensation benefit) or severance pay benefits, or (4) life insurance benefits. Additions to a qualified asset account are included in the fund's qualified cost only to the extent they do not exceed the fund's "account limit" for the taxable year. Sec. 419A(b).

For purposes of the present case, the account limit includes: (1) The amount reasonably and actuarially necessary to fund claims that are incurred but unpaid as of the close of the taxable year and related administrative costs and (2) the amount of an

---

[15] A contribution to a welfare benefit fund in excess of that year's qualified cost is treated as a contribution by the employer to the fund during the succeeding taxable year. Sec. 419(d).

[16] The fund's qualified cost for the taxable year is reduced by the fund's after-tax income for that year. Sec. 419(c)(2).

additional reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for postretirement medical and life insurance benefits.  Sec. 419A(c)(1) and (2).

At issue in this case is the computation of the account limit for the reserve necessary for postretirement medical benefits provided under section 419A(c)(2).  Petitioners and respondent disagree as to the proper method for computing the account limit for "a reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for post-retirement medical benefits".  Additionally, respondent asserts that the investment rates petitioners used in computing the reserve were too low.

B.  Method for Computing the Account Limit With Respect to a Reserve

For 1991, Mercer computed Norwest's contribution to the postretirement medical trust by including (1) the present value of postretirement medical benefits for the active employees amortized over the employees' remaining working lives, and (2) the entire present value of the postretirement medical benefits for the retirees funded in 1 year (the Mercer method).  Respondent asserts that Mercer's methodology in computing Norwest's 1991 contribution for medical benefits to retirees was improper and resulted in a

contribution that exceeded the account limit for a reserve under section 419A(c)(2).[17]  For the reasons set forth below, we disagree with respondent's assertion.  To the contrary, we approve of the Mercer method used in computing Norwest's 1991 contribution to the postretirement trust.

The parties rely on expert reports and testimony to explain actuarial methods appropriate for computing a reserve for postretirement medical benefits described in section 419A(c)(2) and to compute the account limit using those methods.  Petitioners presented the reports and testimony of two expert witnesses: Messrs. Ira Cohen and Gary Scharmer.  Respondent presented the expert report and testimony of Mr. Richard Daskais.  The experts generally agree that actuarial cost methods approved for computing the funding of defined benefit pension plans may be used for computing the funding of postretirement medical benefits.

1.  Actuarial Cost Methods

In calculating reserves, actuaries first calculate the stream of benefits to be paid from the trust (the year-by-year benefit payments to be made to covered employees in future years) and then calculate the present value of that stream by discounting the payment each year at a determined interest or investment rate.  The stream of benefit payments is based on actuarial assumptions.  For postretirement medical benefits, these assumptions include those as

---

[17]    Respondent does not dispute the method petitioners used for computing the contribution for the years 1992-94.

to when employees will retire, how long they will live after retirement, how many will have spouses entitled to benefits, the annual cost of the benefits for each retired employee or spouse, and an interest rate for discounting the stream of benefits to present value.

An actuary uses an actuarial cost method to assign the present value of promised benefits to individual plan years as an annual cost. The portion of the total cost of the plan that is assigned by the actuarial cost method to the current year or to a future year is called the normal cost.

In general, six actuarial cost methods (or variations thereof) are used for purposes of computing pension costs. They include (1) the unit credit method (also known as the accrued benefit cost method); (2) the entry age normal cost method; (3) the individual level premium cost method; (4) the aggregate cost method; (5) the attained age normal cost method; and (6) the frozen initial liability cost method. The methods discussed by the parties' experts are the aggregate cost method (respondent's preferred method), the entry age normal cost method (petitioners' preferred method), and the individual level premium cost method (the method Mercer used in 1991 and the one which we find satisfies the requirements of section 419A(c)(2)).

### a.  Aggregate Cost Method

The aggregate cost method calculates costs for all employees on an aggregate basis.  The aggregate cost method computes normal costs in relation to the assets of the fund; this method does not calculate an accrued liability independent of those assets.

In computing the normal cost under the aggregate cost method, the value of the plan assets is subtracted from the present value of future benefits for all participants.  The remaining present value of future benefits is then divided by the sum of the present value of the future working lives of the active employees.  The present value of the future working life of an employee is comparable to the present value of an annuity (computed with the actuarial interest rate used by the plan) that pays $1 each year until the employee is expected to retire.

### b.  Entry Age Normal Cost Method

The entry age normal cost method can be applied on an individual or aggregate basis; in this case, it is applied on an individual basis.  Under the entry age normal cost method, the actuarial present value of each employee's projected benefit is spread over the entire length of the employee's service, beginning at the date the employee began service with the employer and ending with the anticipated normal retirement date.

The normal cost computed under the entry age normal cost method is a dollar amount which, if paid annually and allowed to

accumulate from the date the employee began service until the projected retirement date of that employee, will have accumulated at retirement the amount necessary to fully fund the benefit to the covered employee. The actuarial accrued liability is the portion of the actuarial present value that is not provided for by future normal costs.

c. <u>Individual Level Premium Cost Method</u>

The individual level premium cost method is an individual method, similar to the entry age normal cost method. Under the individual level premium cost method, the normal cost is separately determined for each covered employee as a level dollar amount which, if accumulated from the later of the date the plan is established or the date that the employee was hired, would accumulate at retirement the amount necessary to fully fund the benefit to the covered employee.

The primary difference between the individual level premium cost method and the entry age normal cost method is the date when normal cost is assumed to commence. If the plan is established after the employee is hired, under the entry age normal cost method, normal cost is assumed to have retroactively commenced at the date of hire. Under the individual level premium cost method, normal cost begins no earlier than the date the plan is established.

2.   <u>Computations by the Experts</u>

The parties' experts described the ways that actuaries interpret the account limit for a reserve provided in section 419A(c)(2) and made computations using variations of the aggregate and entry age normal cost methods.

a.   <u>Mr. Cohen</u>

Mr. Cohen, one of petitioners' experts, is an expert in actuarial science and a principal at PricewaterhouseCoopers LLP, advising clients on various matters involving actuarial, tax, pension, and postretirement medical issues.  He is a fellow of the Society of Actuaries, an enrolled actuary under ERISA, and a member of the American Academy of Actuaries.  From 1970-86, Mr. Cohen was employed by the Internal Revenue Service, serving in a variety of positions, including director of the Employee Plans, Technical and Actuarial Division.

Mr. Cohen uses the terms "reserve" and "accrued liability" interchangeably and posits that the reserve for retirees is the present value of future benefits.  In Mr. Cohen's opinion, the aggregate cost method is not appropriate for computing the account limit for a reserve for postretirement benefits because that method does not directly compute an accrued liability and fails to fully fund the reserve for an employee upon retirement.  In his opinion, the entry age normal cost method is the appropriate method because that method allocates the cost over the entire working life of an

employee, directly computes an accrued liability, and provides for full funding upon retirement.

Mr. Cohen opined that (1) the account limit for the reserve is equal to the reserve (accrued liability) computed under the entry age normal cost method, (2) for retirees, the reserve (accrued liability) is the present value of future benefits, and (3) for active employees, the reserve is the present value of future benefits minus the present value of future normal costs.

b.    Mr. Scharmer

Mr. Scharmer is an expert in actuarial science and is a principal at Mercer.  He is a fellow of the Society of Actuaries, an enrolled actuary under ERISA, a member of the American Academy of Actuaries, and a member of the Conference of Actuaries.

Mr. Scharmer opined that the account limit for a reserve under section 419A(c)(2) was equal to the accrued liability using the entry age normal cost method.  For 1991-94, Mr. Scharmer calculated the account limit for the reserve by applying the entry age normal cost method and by using the same facts and assumptions that Mercer relied upon when it prepared the 1991-94 valuation reports.  Mr. Scharmer computed the accrued liability (dollars in millions) on the valuation date for each year as follows:

| | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| A. Investment return | 5.5% | 4.9% | 3.6% | 3.6% |
| B. Present value accrued benefits (beginning of year) | | | | |
|    a. Active | $14.7 | $38.5 | $62.9 | $83.6 |
|    b. Retired | 28.2 | 36.7 | 47.7 | 48.9 |
|    c. Total | 42.9 | 75.2 | 110.6 | 132.5 |
| C. Accrued liability (beginning of year) | | | | |
|    a. Active | $12.6 | $28.7 | 44.7 | $59.4 |
|    b. Retired | 28.2 | 36.7 | 47.7 | 48.9 |
|    c. Total | 40.8 | 65.4 | 92.4 | 108.3 |
| D. Normal cost (beginning of year) | 0.3 | 1.2 | 2.5 | 3.3 |
| E. Accrued liability (yearend) | | | | |
|    a. Active | $12.3 | $31.2 | $48.7 | $64.7 |
|    b. Retired | 27.8 | 34.5 | 45.2 | 45.8 |
|    c. Total | 40.1 | 65.7 | 93.9 | 110.5 |
| F. Account limit | 40.1 | 65.7 | 93.9 | 110.5 |
| G. Plan assets (VEBA + 401(h)) | -0- | 29.3 | 28.0 | 44.1 |
| H. Deductible limit | 40.1 | 36.4 | 65.9 | 66.4 |

Mr. Scharmer also calculated the account limit for the reserve by varying the application of the aforementioned methodology to reflect the investment rates Mr. Daskais proposed. Under these computations, he determined that the accrued liability (dollars in millions) for 1991-94 was as follows:

| | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| A. Investment return | | 6.0% | 5.7% | 4.9% |
| B. Accrued liability (beginning of year) | | | | |
|    a. Active | $10.3 | $26.1 | $35.0 | $51.6 |
|    b. Retired | 26.0 | 32.3 | 40.0 | 42.4 |
|    c. Total | 36.3 | 58.4 | 75.0 | 94.0 |
| C. Account limit | 36.3 | 58.4 | 75.0 | 94.0 |
| D. Plan assets (VEBA + 401(h)) | -0- | 29.6 | 28.6 | 44.7 |
| E. Deductible limit | 36.3 | 28.8 | 46.4 | 49.3 |

c.  Mr. Daskais

Mr. Daskais, respondent's expert, is an expert in actuarial science.  He is a fellow of the Society of Actuaries and was an enrolled actuary under ERISA from 1976 to 1995.

Mr. Daskais opined that "actuarially determined on a level basis" means that the systematic year-to-year increments to the reserve are the same (or "level" in some sense) each year. Examples of level increments that are appropriate for computing a reserve for postretirement medical benefits include (1) a uniform (or level) dollar amount each year or (2) a uniform (or level) dollar amount per active employee each year, so that the total dollar amount increases or decreases as the number of active employees increases or decreases.[18]

Mr. Daskais opined that in actuarial parlance a "reserve funded over the working lives of covered employees" is a "one-sentence description of the aggregate cost method."  It means a reserve, determined on the basis of an actuarial cost method and actuarial assumptions, that will increase from year to year and will be exactly sufficient to provide the trust fund's benefits at the end of the working lives of the covered employees.  Mr. Daskais

---

[18]    A third example is a uniform (or level) percent of the total payroll of active employees each year, so that the total dollar amount increases or decreases as the total payroll of active employees increases or decreases.  The experts agree that allocating by percentages is inappropriate for postretirement medical benefits because postretirement benefits usually are not pay related.

acknowledged that the reserve funded using the aggregate cost method will not be fully funded with respect to an individual employee upon retirement.  In Mr. Daskais's opinion, full funding upon retirement of an individual employee is not required; in his opinion the end of the working lives of covered employees occurs when the employment of all covered employees has terminated.

Mr. Daskais computed the maximum contribution for 1991-94 to the postretirement medical trust deductible under section 419 by applying the aggregate cost method using the same actuarial values (including the investment rate) Mercer used, as follows:

| | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| A. Investment return | 5.5% | 4.9% | 3.6% | 3.6% |
| B. Present value accrued benefits | | | | |
|    a. Active | $13,361,586 | $38,521,857 | $62,860,146 | $83,594,015 |
|    b. Retired | 26,311,902 | 36,694,928 | 47,731,960 | 48,947,859 |
|    c. Total | 39,673,488 | 75,216,785 | 110,592,106 | 132,541,874 |
| C. Value of assets (beginning of year) | | | | |
|    a. VEBA | --- | 30,736,554 | 30,176,217 | 39,940,676 |
|    b. 401(h) | --- | 1,125,467 | 1,172,269 | 7,598,653 |
|    c. Total | --- | 31,862,021 | 31,348,486 | 47,539,329 |
| D. Nondeductible contribution from prior years (O from prior year) | --- | 22,034,781 | 14,394,743 | 14,426,384 |
| E. Net value of assets[1] | --- | 9,827,240 | 16,953,743 | 33,112,945 |
| F. Present value future normal costs[2] | 39,673,488 | 65,389,545 | 93,638,363 | 99,428,929 |
| G. Average present value of future service | 4.81 | 6.63 | 7.26 | 7.19 |
| H. Normal cost (beginning of year)[3] | 8,248,126 | 9,862,676 | 12,897,846 | 13,828,780 |
| I. Benefits paid during year | N/A | 4,078,160 | 4,859,441 | 5,301,930 |
| J. Employee contributions during year | N/A | 473,833 | 736,176 | 784,906 |
| K. Interest to yearend[4] | 453,647 | 821,352 | 958,237 | 1,335,044 |
| L. Account limit (yearend)[5] | 8,701,773 | 15,781,474 | 25,514,292 | 36,161,092 |
| M. Actual contribution | 30,689,717 | 2,170,000 | 13,966,816 | 12,247,933 |
| N. Value of assets (yearend) | 30,736,554 | 30,176,217 | 39,940,676 | 47,668,557 |
| O. Nondeductible contribution carryforward[6] | 22,034,781 | 14,394,743 | 14,426,384 | 11,507,465 |
| P. Deductible limit[7] | 8,654,936 | 9,810,038 | 13,935,175 | 15,166,852 |

[1]   C.c - D

[2]   B.c - E

[3]   F/G

[4]   A x (C.a - D + H + ½ of (J - I))

[5]   C.a - D + H - I + J + K

[6]   Smaller of (N - L) and (D + M), but not below zero

[7]   D + M - O

In Mr. Daskais's opinion, the investment rates Mercer used were unreasonably low. Mr. Daskais recalculated the contribution limit by applying the aggregate cost method using the Mercer assumptions but substituting investment rates that, in his opinion, were reasonable. Under these computations, he determined that the maximum contributions for 1991-94 were as follows:

| | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| A. Investment return | 6.6% | 6.0% | 5.7% | 4.9% |
| B. Present value accrued benefits | | | | |
|    a. Active | $11,154,103 | $30,515,975 | $38,396,684 | $61,044,923 |
|    b. Retired | 23,798,600 | 33,006,450 | 38,374,995 | 42,599,819 |
|    c. Total | 34,952,703 | 63,522,425 | 76,771,679 | 103,644,742 |
| C. Value of assets (beginning of year) | | | | |
|    a. VEBA | --- | 30,736,554 | 30,176,217 | 39,940,676 |
|    b. 401(h) | --- | 1,125,467 | 1,172,269 | 7,598,653 |
|    c. Total | --- | 31,862,021 | 31,348,486 | 47,539,329 |
| D. Nondeductible contribution from prior years (O from prior year) | --- | 22,679,988 | 16,144,825 | 19,283,596 |
| E. Net value of assets[1] | --- | 9,182,033 | 15,203,661 | 28,255,733 |
| F. Present value future normal costs[2] | 34,952,703 | 54,340,392 | 61,568,018 | 75,389,009 |
| G. Average present value of future service | 4.62 | 6.26 | 6.46 | 6.68 |
| H. Normal cost (beginning of year)[3] | 7,557,754 | 8,682,914 | 9,523,819 | 11,286,962 |
| I. Benefits paid during year | N/A | 4,078,160 | 4,859,441 | 5,301,930 |
| J. Employee contributions during year | N/A | 473,833 | 736,176 | 784,906 |
| K. Interest to yearend[4] | 498,812 | 896,239 | 1,225,134 | 1,454,591 |
| L. Account limit (yearend)[5] | 8,056,566 | 14,031,392 | 20,657,080 | 28,881,609 |
| M. Actual contribution | 30,689,717 | 2,170,000 | 13,966,816 | 12,247,933 |
| N. Value of assets (yearend) | 30,736,554 | 30,176,217 | 39,940,676 | 47,668,557 |
| O. Nondeductible contribution carryforward[6] | 22,679,988 | 16,144,825 | 19,283,596 | 18,786,948 |
| P. Deductible limit[7] | 8,009,729 | 8,705,163 | 10,828,045 | 12,744,581 |

[1]   C.c - D

[2]   B.c - E

[3]   F/G

[4]   A x (C.a - D + H + ½ of (J - I))

[5]   C.a - D + H - I + J + K

[6]   Smaller of (N - L) and (D + M), but not below zero

[7]   D + M - O

Mr. Daskais opined that, if the funding method used to calculate the reserve computes an accrued liability, that liability must be amortized. In Mr. Daskais's opinion, since there are no specific amortization rules applicable to the funding of postretirement medical benefits in section 419A or in the income tax regulations, the amortization rules applicable to pensions should be applied.

Mr. Daskais calculated the contribution limit by applying the entry age normal cost method and by using the same facts and assumptions Mercer used. He amortized the accrued liability over the present value of the remaining working lives of the active employees. Under these computations, he determined that the maximum contributions (dollars in millions; discrepancies attributable to rounding) for 1991-94 were as follows:

|  | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| A. Investment return | 5.5% | 4.9% | 3.6% | 3.6% |
| B. Present value accrued benefits |  |  |  |  |
| a. Active | $13.4 | $38.5 | $62.9 | $83.6 |
| b. Retired | 26.3 | 36.7 | 47.7 | 48.9 |
| c. Total | 39.7 | 75.2 | 110.6 | 132.5 |
| C. Accrued liability |  |  |  |  |
| a. Active | 11.3 | 28.7 | 44.7 | 59.4 |
| b. Retired | 26.3 | 36.7 | 47.7 | 48.9 |
| c. Total | 37.6 | 65.4 | 92.4 | 108.3 |
| D. Normal cost | 0.3 | 1.2 | 2.5 | 3.3 |
| E. Average present value of future service | 4.81 | 6.63 | 7.26 | 7.19 |
| F. Amortized accrued liability from prior years[1] | --- | 8.6 | 15.5 | 25.5 |
| G. Remaining unamortized accrued liability[2] | 37.6 | 56.8 | 76.9 | 82.8 |
| H. Amortization of accrued liability[3] | 7.8 | 8.6 | 10.6 | 11.5 |
| I. Account limit (beginning of year)[4] | 8.1 | 18.3 | 28.6 | 40.3 |
| J. Interest to yearend | 0.4 | 0.9 | 1.0 | 1.5 |
| K. Account limit (yearend)[5] | 8.6 | 19.2 | 29.7 | 41.7 |

| | | | | |
|---|---|---|---|---|
| L. Benefits paid less employee contributions | --- | 3.6 | 4.1 | --- |
| M. Interest for one-half year | --- | 0.1 | 0.1 | --- |
| N. Amortized accrued liability (yearend)[6] | 8.6 | 15.5 | 25.5 | --- |
| O. Nondeductible contribution from prior years[7] | --- | 22.1 | 15.3 | 16.2 |
| P. Actuarial value of assets | | | | |
|    a. VEBA | --- | 30.7 | 30.2 | 39.9 |
|    b. 401(h) | --- | 1.1 | 1.2 | 7.6 |
|    c. Total (beginning of year) | --- | 31.9 | 31.3 | 47.5 |
|    d. Net after nondeductible contributions[8] | --- | 9.7 | 16.1 | 31.3 |
|    e. Interest to yearend | --- | 0.5 | 0.6 | 1.1 |
|    f. Total (yearend)[9] | --- | 10.2 | 16.7 | 32.4 |
| Q. Actual contribution | 30.7 | 2.2 | 14.0 | 12.2 |
| R. Deductible contribution[10] | 8.6 | 9.0 | 13.0 | 9.3 |
| S. Nondeductible contribution carryforward[11] | 22.1 | 15.3 | 16.2 | 19.2 |

[1]   N of prior year
[2]   C.c - F
[3]   G/E
[4]   D + F + H
[5]   I + J
[6]   K - L - M
[7]   S of prior year
[8]   P.c - O
[9]   P.d + P.e
[10]   Smaller of (K - P) and (O + Q)
[11]   O + Q - R

Mr. Daskais also calculated the contribution limit by applying his variation of the entry age normal cost method (amortizing the accrued liability over the remaining lives of the active employees) as above but substituting investment rates that, in his opinion, were reasonable. Under these computations, he determined that the maximum contributions (dollars in millions; discrepancies attributable to rounding) for 1991-94 were as follows:

|  | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| A. Investment return | 6.6% | 6.0% | 5.7% | 4.9% |
| B. Present value accrued benefits |  |  |  |  |
|     a. Active | $11.2 | $30.5 | $38.4 | $61.0 |
|     b. Retired | 23.8 | 33.0 | 38.4 | 42.6 |
|     c. Total | 35.0 | 63.5 | 76.8 | 103.6 |
| C. Accrued liability |  |  |  |  |
|     a. Active | 9.4 | 22.7 | 27.3 | 43.4 |
|     b. Retired | 23.8 | 33.0 | 38.4 | 42.6 |
|     c. Total | 33.1 | 55.2 | 64.1 | 84.7 |
| D. Normal cost | 0.2 | 1.0 | 1.5 | 2.4 |
| E. Average present value of future service | 4.62 | 6.26 | 6.46 | 6.68 |
| F. Amortized accrued liability from prior years[1] | --- | 7.9 | 13.7 | 20.1 |
| G. Remaining unamortized accrued liability[2] | 33.1 | 47.3 | 50.4 | 64.6 |
| H. Amortization of accrued liability[3] | 7.2 | 7.6 | 7.8 | 9.7 |
| I. Account limit (beginning of year)[4] | 7.4 | 16.4 | 23.0 | 32.2 |
| J. Interest to yearend | 0.5 | 1.0 | 1.3 | 1.6 |
| K. Account limit (yearend)[5] | 7.9 | 17.4 | 24.3 | 33.8 |
| L. Benefits paid less employee contributions | --- | 3.6 | 4.1 | --- |
| M. Interest for one-half year | --- | 0.1 | 0.1 | --- |
| N. Amortized accrued liability (yearend)[6] | 7.9 | 13.7 | 20.1 | --- |
| O. Nondeductible contribution from prior years[7] | --- | 22.8 | 17.2 | 21.8 |
| P. Actuarial value of assets |  |  |  |  |
|     a. VEBA | --- | 30.7 | 30.2 | 39.9 |
|     b. 401(h) | --- | 1.1 | 1.2 | 7.6 |
|     c. Total (beginning of year) | --- | 31.9 | 31.3 | 47.5 |
|     d. Net after nondeductible contributions[8] | --- | 9.1 | 14.2 | 25.8 |
|     e. Interest to yearend | --- | 0.5 | 0.8 | 1.3 |
|     f. Total (yearend)[9] | --- | 9.6 | 15.0 | 27.0 |
| Q. Actual contribution | 30.7 | 2.2 | 14.0 | 12.2 |
| R. Deductible contribution[10] | 7.9 | 7.8 | 9.4 | 6.7 |
| S. Nondeductible contribution carryforward[11] | 22.8 | 17.2 | 21.8 | 27.3 |

[1]    N of prior year
[2]    C.c - F
[3]    G/E
[4]    D + F + H
[5]    I + J
[6]    K - L - M
[7]    S of prior year
[8]    P.c - O
[9]    P.d + P.e

- 33 -

[10]    Smaller of (K − P) and (O + Q)
[11]    O + Q − R

### 3.    Positions of the Parties

Petitioners assert that the reserve under section 419A(c)(2) refers to the employer's accrued liability to provide the postretirement benefits.  Petitioners maintain that, since the entry age normal cost method is the only method that directly computes an accrued liability and allocates the present value of an employee's future benefit over the employee's entire working life, the account limit for the reserve is equal to the accrued liability computed under the entry age normal cost method.  Petitioners further maintain that (1) for a retiree the accrued liability is the present value of the employee's future benefits, and (2) for an active employee the accrued liability is the present value of the employee's future benefits minus the present value of future normal costs determined under the entry age normal cost method. Petitioners contend that their contribution to the reserve for each year at issue did not cause the reserve to exceed the account limit and, therefore, the contributions were deductible under section 419.

Respondent argues that petitioners' position is inconsistent with (1) the language of section 419A(c)(2), (2) the established judicial precedent interpreting that section, (3) Congress's purpose in enacting that section, (4) the accepted interpretation given "nearly identical language" in the provisions governing

pension plans, (5) the law in effect before the enactment of section 419, and (6) principles of actuarial practice. Respondent contends that the cost of the postretirement benefit must be spread over the <u>remaining</u> working lives of the covered employees. Respondent further contends that, since retirees have no remaining working lives, the cost must spread over the <u>remaining</u> working lives of the <u>active</u> employees. Respondent concludes, therefore, that the aggregate cost method is the proper method for computing the account limit for the reserve under section 419A(c)(2). Respondent asserts in the alternative that, if the entry age normal cost method is a proper method, then the accrued liability must be amortized over the remaining lives of the active employees.

4.   <u>Statutory Construction</u>

"Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 340 (1997). We look to the legislative history primarily to learn the purpose of the statute and to resolve any ambiguity in the words contained in the text. <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244 (1994); <u>Commissioner v. Soliman</u>, 506 U.S. 168, 174 (1993); <u>Consumer Prod. Safety Commn. v. GTE Sylvania, Inc.</u>, 447 U.S. 102, 108 (1980); <u>United States v. Am. Trucking Associations, Inc.</u>, 310 U.S. 534, 543-544 (1940); <u>Allen v. Commissioner</u>, 118 T.C. 1, 7 (2002); <u>Venture Funding, Ltd. v.</u>

Commissioner, 110 T.C. 236, 241-242 (1998), affd. without published opinion 198 F.3d 248 (6th Cir. 1999); Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 299 (1996). Where Congress has expressed its will in reasonably plain terms, those terms must ordinarily be regarded as conclusive. Negonsott v. Samuels, 507 U.S. 99, 104 (1993).

The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469 (1992); McCarthy v. Bronson, 500 U.S. 136, 139 (1991). In analyzing the plain meaning of section 419A(c)(2), we examine the section as a whole, with all of its subsections in mind. See Hellmich v. Hellman, 276 U.S. 233, 237 (1928); Huffman v. Commissioner, 978 F.2d 1139, 1145 (9th Cir. 1992), affg. in part, revg. and remanding in part T.C. Memo. 1991-144.

5. The Statute

We begin with the specific language of section 419A(c)(2), which provides:

> The account limit for any taxable year may include a reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for--
>
> (A) post-retirement medical benefits to be provided to covered employees (determined on the basis of current medical costs), or

(B) post-retirement life insurance benefits to be provided to covered employees.

We first addressed the requirements of section 419A(c)(2) in Gen. Signal Corp. v. Commissioner, 103 T.C. 216, 239 (1994), affd. 142 F.3d 546 (2d Cir. 1998). In that case, we held that section 419A(c)(2) requires an accumulation of assets equal to the deduction taken, and that those assets must be used to pay welfare benefit expenses of retired employees. See also Square D Co. v. Commissioner, 109 T.C. 200 (1997); Parker-Hannifin Corp. v. Commissioner, T.C. Memo. 1996-337, affd. in part, revd. in part and remanded 139 F.3d 1090 (6th Cir. 1998). In Gen. Signal Corp., Square D Co., and Parker-Hannifin Corp., we found that no reserves had been created, obviating the need to consider whether the contributions were excessive from an actuarial standpoint. In the case at hand, respondent agrees that a reserve was created; i.e., assets in the amount of the deduction taken were accumulated to be used to pay medical expenses of retired employees.

a. Reserve

Petitioners assert that the term "reserve" in section 419A(c)(2) refers to the employer's accrued liability to provide the postretirement benefits. Petitioners conclude, therefore, that the method used in computing the reserve must compute the accrued liability.

Respondent asserts that section 419A(c)(2) does not define the account limit but rather describes contributions to a reserve

(equal to the normal cost computed under the aggregate cost method) which may be included as a component of the account limit, together with the amounts set aside for incurred but unpaid claims. Respondent concludes, therefore, that section 419A(c)(2) does not require the computation of the accrued liability.

A comparison of the language in section 419A(c)(1) with that in section 419A(c)(2) belies respondent's position. Section 419A(c)(1) provides that the account limit "for any taxable year is the amount reasonably and actuarially necessary <u>to fund</u>" (emphasis supplied) incurred but unpaid claims and administrative costs with respect to such claims. By contrast, section 419A(c)(2) provides that the account limit "for any taxable year may include a reserve".

Congress could have used identical language in both provisions; the fact that Congress chose not to do so must be given heed. Cf. <u>Keene Corp. v. United States</u>, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another * * *, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (Internal quotation marks and citation omitted.)); <u>United States v. $359,500 in U.S. Currency</u>, 828 F.2d 930, 933 (2d Cir. 1987) ("'contrasting language in similar statutes may show that the legislature intended different standards of compliance'" (quoting 2A Singer, Sutherland Statutory Construction,

sec. 57.06, at 654 (Sands 4th ed. 1984))). Thus, it is the reserve, not merely a contribution equal to the normal cost for the year, that must be computed in determining the account limit.

Respondent asserts that courts have held in prior cases, such as Gen. Signal Corp. v. Commissioner, supra, Square D Co. v. Commissioner, supra, and Parker-Hannifin Corp. v. Commissioner, supra, that "reserve" as used in section 419A(c)(2) does not mean a measure of liability. At issue in those cases, however, was whether section 419A(c)(2) required the actual funding of a reserve. The taxpayers in those cases argued that term "reserve" was an actuarial term of art meaning "a quantity of liability" that did not require actual funding. We held that a mere quantity of liability does not constitute a "reserve funded over the working lives of the covered employees"; i.e., we held that section 419A(c)(2) requires the actual funding of the reserve.

When Congress uses a term of art that has an established meaning, a strong presumption arises that Congress intends to incorporate that meaning. Morissette v. United States, 342 U.S. 246, 263 (1952). Congress's choice of the word "reserve" (rather than "account" or "fund", for example) connotes a measure of liability. W. Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. 338, 373 (1994) ("reserves * * * are estimates of liabilities: '"best estimates" of future settlement costs'" (quoting Salzmann, Estimated Liabilities For Losses & Loss Adjustment Expenses 155

(1984))), affd. 65 F.3d 90 (8th Cir. 1995); see also Ins. Co. of N. Am. v. McCoach, 224 F. 657, 659 (3d Cir. 1915) (defining "reserve funds" as "funds as must be reserved to meet liabilities"); Black's Law Dictionary 1309 (7th ed. 1999) (defining "reserve" to mean "Something retained or stored for future use; esp., a fund of money set aside by a bank or an insurance company to cover future liabilities.").

Section 419A(c)(2) includes in the account limit a reserve funded for the payment of postretirement medical (or life insurance) benefits. The payment of those benefits is a liability of the employer, and "reserve" as used in section 419A(c)(2) connotes a measure of that liability; it refers to the accumulation of assets in an amount necessary to satisfy the employer's liability to pay the covered employees' postretirement medical (or life insurance) benefits when those benefits become due.

      b.   <u>Reserve Funded Over the Working Lives of the Covered Employees and Actuarially Determined on a Level Basis</u>

Section 419A(c)(2) limits the reserve that may be included in the account limit to "a reserve funded over the lives of the covered employees and actuarially determined on a level basis".

Respondent asserts that Norwest's contribution in 1991 was excessive because it created a reserve that was not "funded over the working lives of the covered employees and actuarially determined on a level basis". Respondent maintains that the

language of section 419A(c)(2) is, in essence, a one-clause definition of the aggregate cost method. Respondent posits that section 419A requires that (1) a reserve for postretirement benefits must be "funded"; i.e., contributions must be made for the purpose of providing postretirement medical benefits, and (2) the funding must be done on a "level" basis over the working lives of the employees. Respondent contends that the funding cannot begin before the reserve is created and, therefore, the funding must be determined on a level basis over the <u>remaining</u> working lives of the covered employees. Respondent concludes that, since retired employees have no remaining working lives, the funding must be determined on a level basis over the remaining working lives of the <u>active</u> employees. Disagreeing with respondent, petitioners assert that the term "funded" means "calculated", not "contributed", and that the reserve (accrued liability) is calculated over the working lives of the covered employees. Thus, petitioners conclude that the reserve included in the account limit is an actuarially determined accrued liability (i.e., a "reserve") that is calculated (i.e., "funded") over the working lives of the covered employees.

(i) <u>Reserve Funded Over the Working Lives of the Covered Employees</u>

We do not agree with petitioners that funded means calculated. We have previously held that the "funded" reserve in section 419A(c)(2) refers to an accumulation of assets and the funding of benefits. <u>Natl. Presto Indus., Inc. v. Commissioner</u>, 104 T.C. 559,

574 (1995). A "reserve funded over the working lives of the covered employees" "clearly evokes the gradual accumulation of funds measured with an eye toward complete funding at the time of retirement". <u>Gen. Signal Corp. v. Commissioner</u>, 142 F.3d at 549 (citing <u>Parker-Hannifin Corp. v. Commissioner</u>, 139 F.3d 1090, 1094 (6th Cir. 1998)). We agree with respondent that the funding of the reserve cannot begin until the reserve is created. However, we do not agree with respondent that the reserve must be funded over the aggregate remaining working lives of the active employees.

Respondent asserts that once the reserve is created it may be funded over the aggregate working lives of the covered employees and that the end of the working lives of the covered employees occurs when the last covered employee is no longer employed by the employer, because the employment of all covered employees has terminated. Respondent acknowledges that, under that reading, the reserve will not be fully funded upon retirement with respect to any individual employee (except the last employee). The position taken by respondent in this case is contrary to the position successfully urged by the Commissioner in <u>Gen. Signal Corp.</u> In <u>Gen. Signal Corp. v. Commissioner</u>, 142 F.3d at 549, the Court of Appeals for the Second Circuit agreed with the Commissioner's interpretation that the phrase "funded over the working lives" means that "the amount that is supposed to be added to the reserve each year would, assuming the reserve remained intact, result in

full funding for retirement benefits at the end of <u>each</u> employee's term of service." (Emphasis supplied.)

Respondent acknowledges that sections 419 and 419A do not impose an obligation on an employer to create a reserve to pay for postretirement medical benefits; i.e., employers may pay and deduct the medical claims as they become due on a pay-as-you-go basis. Respondent further acknowledges that if an employer establishes a reserve under section 419A(c)(2), sections 419 and 419A do not impose a minimum annual contribution requirement or require an employer to make contributions that are precisely level. Respondent contends, however, that "funded" in section 419A(c)(2) is synonymous with "amortized" and that if an employer does not make a contribution in a given year, then the "contribution that was not made would be funded over the remaining working lives of employees in subsequent years". Respondent asserts that the language "funded over the working lives of the covered employees" is essentially identical to the language of section 404(a)(1)(A)(ii), and, therefore, any accrued liability must be amortized over the remaining lives of the active employees. We disagree.

The language of section 404(a)(1)(A)(ii) is clearly different from the language of 419A(c)(2). When applicable,[19] section

---

[19] The deduction for a contribution to a pension trust is limited to the amount provided in sec. 404(a)(1)(A)(ii) when it exceeds the minimum funding amount provided in sec. 412(a) and the
(continued...)

404(a)(1)(A)(ii) limits the deduction for a contribution to a pension plan to "the amount necessary to provide with respect to all of the employees under the trust the remaining unfunded cost of their past and current service credits distributed as a level amount * * * over the remaining future service of each such employee". The phrases "over the remaining future service of each such employee" (the section 404(a)(1)(A)(ii) language) and "over the working lives of the covered employees" (the section 419A(c)(2) language) are not identical. We give heed to the fact that Congress could have used identical language in both the pension and VEBA provisions but chose not to do so.

Moreover, Congress in section 419A(e)(1) specifically made the pension nondiscrimination rules of section 505(b) applicable to the section 419A(c)(2) reserve. This is an indication that Congress did not intend to automatically apply pension provisions to section 419A. Additionally, in section 419(c)(3), Congress provided for the amortization of the adjusted basis of a child care facility over 60 months. This is a further indication that Congress did not intend to require amortization of the postretirement benefit of a retired employee.

When Congress has intended to require costs to be spread over the _remaining_ working lives of _active_ employees, it has done so clearly. For example, the funding period for purposes of

---

[19](...continued)
amount provided in sec. 404(a)(1)(A)(iii).

contributions to a black lung benefit trust[20] is the greater of "(i) the average remaining working life of miners who are present employees of the taxpayer, or (ii) 10 taxable years." Sec. 192(c)(1)(B). We conclude, therefore, that the amortization rules applicable to pensions do not apply to the computation of the section 419A(c)(2) reserve.

In Gen. Signal Corp. v. Commissioner, 103 T.C. at 240, in light of the taxpayer's assertions that the phrase "reserve funded" does not have a commonly understood meaning, we assumed arguendo that the phrase was ambiguous and considered the legislative history. We shall do likewise in this case.

In consulting the legislative history of section 419A, we are mindful that the relevant portion of the committee report states:

> Prefunding of life insurance, death benefits, or medical benefits for retirees.--The qualified asset account limits allow amounts reasonably necessary to accumulate reserves under a welfare benefit plan so that

---

[20] Sec. 192(b) limits contributions to a black lung benefit trust as follows:

SEC. 192(b). Limitation.--The maximum amount of the deduction allowed by subsection (a) for any taxpayer for any taxable year shall not exceed the greater of--

(1) the amount necessary to fund (with level funding) the remaining unfunded liability of the taxpayer for black lung claims filed (or expected to be filed) by (or with respect to) past or present employees of the taxpayer, or

(2) the aggregate amount necessary to increase each trust described in section 501(c)(21) to the amount required to pay all amounts payable out of such trust for the taxable year.

the medical benefit or life insurance (including death benefit) payable to a retired employee during retirement is fully funded upon retirement.  These amounts may be accumulated no more rapidly than on a level basis over the working life of the employee, with the employer of each employee. * * *  The conferees intend that the Treasury Department prescribe rules requiring that the funding of retiree benefits be based on reasonable and consistently applied actuarial cost methods, which take into account experience gains and losses, changes in assumptions, and other similar items, and be no more rapid than on a level basis over the remaining working lifetimes of the current participants. * * * [H. Conf. Rept. 98-861, at 1157 (1984), 1984-3 C.B. (Vol. 2) 1, 411.]

The legislative history makes clear that the funding of the reserve can be completed <u>no more rapidly</u> than over the working life of the employee.  Therefore, we conclude that fully funding the reserve at or after retirement is permissible because, in that case, the assets are accumulated <u>less rapidly</u> than over the working life of the employee.

To conclude this aspect of our deliberation, we hold that for purposes of section 419A(c)(2), the phrase "reserve funded over the working lives of the covered employees" means that assets necessary to satisfy the employer's liability may be accumulated no more rapidly than over the working lives of the covered employees, such that the reserve with respect to an employee can be fully funded no earlier than upon retirement of the employee.

### (ii) Reserve Actuarially Determined on a Level Basis

We now turn our attention to the requirement that the reserve under section 419A(c)(2) be "actuarially determined on a level basis" and the calculation of the reserve.  We have held that the term "reserve" in section 419A(c)(2) refers to assets in an amount necessary to satisfy the employer's liability to pay the covered employees' postretirement medical benefits when the benefits become due.

Petitioners assert that "level", as an actuarial concept, refers to normal cost and that, to an actuary, "level" means that the normal costs are level.  Normal cost is that portion of the present value of the benefit that is assigned to the current or a future year.  In other words, the value of the benefit assigned to the current year is the same as the amount assigned to each subsequent year until the employee's retirement date.  Petitioners further assert that the actuarial concept of level is unrelated to the employer's actual contributions to a plan and that actuarial methods determine amounts that can be contributed but do not mandate funding.

Petitioners acknowledge that both the aggregate and entry age normal cost methods produce level normal costs.  Petitioners assert, however, that the aggregate cost method is not appropriate because it does not directly calculate the accrued liability independently of the assets.

Respondent asserts that a direct calculation of the accrued liability independent of the assets is not necessary. Respondent contends that the actuary must compute on a level basis a reserve funded over the working lives of the covered employees. Further, respondent posits that since the funding does not begin before the reserve is created, the reserve must be computed by allocating the cost in a level amount over the remaining lives of the employees. Respondent contends that (1) the actuarial methodology used must determine contributions at a "rate" that would be level if actuarial assumptions were exactly realized, (2) the funds may only accumulate gradually, and (3) in order to accomplish the gradual funding, the actuarial method must provide for the ratable accumulation of funds over the remaining working lives of the covered employees. Respondent asserts that the following excerpt from the legislative history supports his position: "The conferees intend * * * that the funding of retiree benefits * * * be no more rapid than on a level basis over the remaining working lifetimes of the current participants". H. Conf. Rept. 98-861, supra at 1157, 1984-3 C.B. (Vol. 2) at 411. Respondent contends that once an employer elects to fund a reserve for postretirement benefits under section 419A(c)(2), it must then select an actuarial cost method that satisfies this statutory requirement. Respondent concludes that the aggregate cost method properly allocates the costs in a level amount over the remaining lives of the covered employees. In

the alternative, respondent argues that, if the method used calculates an accrued liability independently of the fund assets, the unfunded accrued liability must be amortized over the remaining lives of the active employees.

We believe that use of the aggregate cost method to compute the reserve is not appropriate because that method will not permit full funding of the reserve with respect to a retired employee at retirement of that employee.  Further, we agree with petitioners that the accrued liability should be computed independently of the plan assets.  Indeed, there are circumstances under which the reserve could become overfunded and yet additional amounts could be added to the reserve using the aggregate cost method.[21]  We have no doubt that, in such an event, the Commissioner would require the use of another method that directly calculates an accrued liability independently of the plan assets.  Additionally, we have held that section 419A(c)(2) does not require the amortization of the accrued liability.

Section 419A(c)(2) requires that the reserve funded over the lives of the covered employees be "actuarially determined on a level basis".  Thus, assets necessary to satisfy the employer's

---

[21]    We note that use of the aggregate cost method is not permitted in computing the full-funding limit for pensions under sec. 412. Sec. 412(c)(7) defines the term "full-funding limitation" for purposes of sec. 412(c)(6) as the excess of the accrued liability (including normal cost) under the plan, over the value of the plan's assets.  The accrued liability is determined under the entry age normal cost method if the accrued liability cannot be directly calculated under the funding method used for the plan.

liability may be accumulated no more rapidly than on a level basis over the working lives of the covered employees, such that the reserve with respect to an employee can be fully funded no earlier than upon retirement of the employee. We conclude that the maximum amount of the liability that may be satisfied by the reserve is the amount at the time with respect to which the reserve is computed that, together with future normal costs and interest, will be sufficient upon retirement of each employee to pay future medical claims of the employee when they become due. See, e.g., United States v. Atlas Life Ins. Co., 381 U.S. 233, 236 n.3 (1965); Travelers Ins. Co. v. United States, 303 F.3d 1373, 1380-1381 (Fed. Cir. 2002); Natl. States Ins. Co. v. Commissioner, 758 F.2d 1277, 1278 (8th Cir. 1985) (a reserve is computed by calculating the excess of the present value of future benefits payable over the present value of future net premiums receivable), affg. 81 T.C. 325 (1983). That amount must be actuarially determined on a level basis.

The actuarial present value of the projected benefit of each covered employee should be allocated on a level basis to each year commencing with the year in which the allocation is first recognized and ending with the year the employee is expected to retire. The funding of "a reserve funded over the working lives of the covered employees" cannot begin until the reserve is created. Thus, the allocation is first recognized on the later of the date

when the reserve is created and the date the employee becomes a covered employee.  Essentially, this is the individual level premium cost method with the date of the creation of the reserve substituted for the date the plan is instituted.  When the year in which the allocation is first recognized is after the employee has retired, there are no future years to which the benefits may be allocated.  Since there are no future years to which the benefits may be allocated, there are no future normal costs, and the entire present value of the projected benefit is properly allocated to the first year.  This is the method that Mercer used in computing Norwest's contribution for 1991, the year the reserve was created.

The individual level premium cost method comports with our holding that the amount of the liability that may be satisfied by the reserve is the amount at the time with respect to which the reserve is computed that, together with future normal costs and interest, will be sufficient upon retirement of an employee to pay future medical claims of the employee when they become due.  See, e.g., United States v. Atlas Life Ins. Co., supra; Travelers Ins. Co. v. United States, supra; Best Life Assur. Co. v. Commissioner, 281 F.3d 828, 830 (9th Cir. 2002), affg. T.C. Memo. 2000-134; Natl. States Ins. Co. v. Commissioner, supra; Sears, Roebuck & Co. v. Commissioner, 96 T.C. 61, 110 (1991), revd. on other grounds 972 F.2d 858 (7th Cir. 1992).

C.    Investment Rates

The pretax and after-tax investment rates[22] Mercer used in the 1991-94 valuation reports were as follows:

|                | 1991 | 1992 | 1993 | 1994 |
|----------------|------|------|------|------|
| Pretax rate    | 9.0% | 8.0% | 6.0% | 6.0% |
| After-tax rate | 5.5  | 4.9  | 3.6  | 3.6  |

The after-tax investment rate was determined by applying a tax rate of 39 percent for 1991-92 and 40 percent for 1993-94.

In the notices of deficiency, respondent did not dispute the actuarial assumptions, including the pretax and after-tax investment rates, Mercer used in the 1991-94 valuation reports.  In an amended answer, however, respondent asserted that the pretax investment rates used in the 1993 and 1994 calculations and the after-tax investment rate used in the computation for all years 1991-94 were too low.

Respondent asserts that the pretax and after-tax rates Mr. Daskais proposed are reasonable and demonstrate that the rates petitioners used are unreasonable.  The pretax and after-tax investment rates Mr. Daskais proposed are as follows:

|                | 1991 | 1992 | 1993 | 1994 |
|----------------|------|------|------|------|
| Pretax rate    | 9.0% | 8.0% | 8.0% | 7.0% |
| After-tax rate | 6.6  | 6.0  | 5.7  | 4.9  |

Mr. Daskais determined the after-tax investment rates by applying a tax rate of 29 percent for 1991-92 and 31.9 percent for

---

[22]    Unless otherwise indicated, all rates are rounded to the nearest tenth of 1 percent.

1992-94. In our opinion, Mr. Daskais's after-tax rates are too high because they do not take into account the Minnesota State tax on unrelated business income. Minnesota taxes the unrelated income of an exempt organization at the corporate rate of 9.8 percent. Minn. Stat. Ann. secs. 290.05, subd. 3, and 290.06, subd. 1 (West 1999 & Supp. 2003). Since State taxes paid are deducted for purposes of Federal tax, the combined tax rate would be 36 percent[23] for 1991-92 and 38.6 percent[24] for 1993-94. Applying the combined tax rates to the pretax investment rates Mr. Daskais considers reasonable results in the following after-tax investment rates (rounded to nearest tenth of a percent):

|                | 1991 | 1992 | 1993 | 1994 |
|----------------|------|------|------|------|
| Pretax rate    | 9.0% | 8.0% | 8.0% | 7.0% |
| After-tax rate | 5.8  | 5.1  | 4.9  | 4.3  |

---

[23] The combined tax rate for 1991-92 is computed as follows:

| | |
|---|---|
| Starting point | 100.0% |
| Minn. State tax at 9.8% (100 x 9.8%) | - 9.8 |
| | 90.2 |
| Federal tax at 29% (90.2 x 29%) | -26.2 |
| | 64.0 |
| Combined tax rate (100% - 64%) | 36 |

[24] The combined tax rate for 1993-94 is computed as follows:

| | |
|---|---|
| Starting point | 100.0 % |
| Minn. State tax at 9.8% (100 x 9.8%) | - 9.8 |
| | 90.2 |
| Federal tax at 31.9% (90.2 x 31.9%) | -28.8 |
| | 61.4 |
| Combined tax rate (100% - 61.4%) | 38.6 |

The difference of 0.3 percent between the 5.8-percent after-tax rate computed for 1991 and the 5.5-percent after-tax rate petitioners used in 1991 is relatively minimal and does not establish that the 5.5-percent rate was unreasonable.

Moreover, the Internal Revenue Service publishes a permissible range of interest rates used to calculate the current liability for purposes of the full-funding limitation for pensions under section 412(c)(7). See Notice 88-73, 1988-2 C.B. 383. Although we are mindful that Notice 88-73, supra, provides that no inference should be drawn from the notice as to any issue not specifically addressed therein, in the absence of regulations or other guidance to the contrary, in our opinion rates that fall within the permissible range of rates for purposes of the full-funding limitations on pensions are reasonable for purposes of computing the reserve under section 419A(c)(2).

The published range for a January 1991 valuation date is 7.77-9.49 percent. Notice 91-5, 1991-1 C.B. 315. The income of a pension trust is not taxable, and the interest rates provided for purposes of the full-funding limitation represent pretax rates. Application of a 36-percent combined tax rate to 7.8 percent (the lowest investment rate (rounded) in the permissible range for purposes of section 412(c)(7)) gives an after-tax investment rate of 5.0 percent, which we believe supports the reasonableness of the 5.5-percent after-tax rate petitioners used for 1991.

In computing Norwest's contribution for 1991, Mercer applied a reasonable investment rate and used the appropriate individual level premium cost method. We conclude, therefore, that Norwest's contribution to fund the reserve under section 419A(c)(2) for 1991 did not exceed the account limit.

Further, for years 1992-94, even using the higher after-tax investment rates Mr. Daskais proposed of 6.0 percent for 1992, 5.7 percent for 1993, and 4.9 percent for 1994, it is clear that Norwest's contributions to fund the reserve do not exceed the account limit when the reserve is computed by applying the individual level premium cost method.

We conclude that Norwest's contributions to the postretirement benefit trust to fund a reserve for postretirement medical benefits for 1991-94 did not exceed the account limit for a reserve under section 419A(c)(2). We hold, therefore, that in computing petitioners' consolidated income tax for 1991-94, petitioners are entitled to deductions for postretirement medical benefit contributions of $30,689,717 in 1991, $2,170,000 in 1992, $13,791,600 in 1993, and $12,247,933 in 1994.

To reflect the foregoing, and because other issues in these cases remain for resolution,

An appropriate order will

be issued.
